James K. ALBURY,
Defendant-Below, Appellant,

v.

STATE of Delaware,
Plaintiff-Below, Appellee.

Supreme Court of Delaware.

Submitted: Sept. 27, 1988.
Decided: Nov. 28, 1988.
Rehearing Denied Dec. 16, 1988.

Nancy Jane Perillo, Wilmington, on behalf of appellant.

Rosemary K. Killian (argued), and Richard E. Fairbanks, Jr., Deputy Attys. Gen., Wilmington, on behalf of appellee.

Before MOORE, WALSH and HOLLAND, JJ.

HOLLAND, Justice:

On April 14, 1980, the defendant-appellant, James K. Albury ("Albury"), entered a guilty plea to murder in the first degree, 11 *Del. C.* § 636(a)(1). Albury was sentenced to life in prison without probation or parole. On December 14, 1984, Albury

filed a motion for postconviction relief seeking to withdraw his guilty plea on the grounds of ineffective assistance of counsel. Following an evidentiary hearing by the trial court, the motion was denied. Albury now appeals the denial of that motion to this Court.

Albury has raised three issues in this appeal. He contends through his attorney that: (1) his original attorney's representation violated his Sixth Amendment right to "effective assistance of counsel," and was prejudicial because it resulted in the entry of his guilty plea; (2) the investigation of the facts and pertinent law surrounding his case, by his original counsel, was so deficient that the entry of his guilty plea was involuntary and violative of his right to due process of law; and (3) the prosecutor's refusal to offer a reduced plea on the homicide charge was based on arbitrary policies, and, therefore, constituted an abuse of prosecutorial discretion. The trial court considered and denied each of Albury's contentions. We have concluded that Albury's motion for postconviction relief was properly denied.

*Background Facts*

On December 21, 1979, the appellant, Albury, shot and killed Susan Layton ("Layton"), his estranged girlfriend and the mother of his infant daughter. Approximately one month prior to the shooting, Albury and Layton had acrimoniously severed their personal relationship. Following their separation, Layton had expressed fears about her safety to friends, family, and employer. Layton is alleged to have told them that Albury had made oral and written threats upon her life.

Albury and Layton were both employed by the DuPont Company and were scheduled to begin work at midnight on the day that Layton was shot. The shooting took place in the parking lot of the DuPont Company plant in Seaford, Delaware. Albury arrived at the parking lot before Layton. Albury waited for Layton with a loaded gun.[1] Prior to arriving at the parking lot, Albury admitted that he had consumed a substantial amount of alcohol, including vodka, wine, and beer. He had also smoked some marijuana.

When Layton arrived at the parking lot, Albury approached her car with the loaded gun. After a brief verbal exchange, Albury shot Layton four times at close range. Albury immediately fled to the home of one of his friends. That friend called the police to report the shooting. Albury was arrested shortly thereafter at the friend's home. Following his arrest, Albury gave a statement to the police in which he admitted shooting Layton.[2]

---

**1.** The record reflects that Albury purchased the gun after his separation from Layton.

**2.** Albury's statement reads as follows:

We ended up arguing over the phone today just before I hung up on her. This was about 6:00 p.m. Then I went back home and changed into my work clothes and went to a friend's home. His name is Corbett Cannon and [he] lives in Chandler Heights Apts., Seaford, Del. I left my pistol home at that time. I drank maybe four beers and a little wine between 8:00 p.m. and 10:30 p.m. I thought about hurting her in some way when we were arguing over the phone, but I later forgot about it. After I left Corbett's home, I just rode around for a while, and then I went back home and got my pistol and holster out of my cigar box. I did this mainly because I was a little afraid of her father. He had threatened me some recently. He held it against me because I am black and Susan is white. Susan and I both worked at DuPont's in Seaford, so tonight, I went to the plant a little early to wait for her. I just wanted to talk to her and try to see what the problem was. I had been sitting in my car about three minutes when Susan pulled up in her car. I got out of my car and walked over to the driver's side of her car and opened her car door. She got hysterical and started yelling and said she was afraid that I was going to hurt her. I tried to talk and reason with her, but she just kept saying that I was going to kill her and I said, no, I wasn't. She tried to get out of the passenger's side of the car, and I grabbed her arm. She was still screaming, and that is when I pulled my pistol out of my holster. I then shot at her, I believe three times, through the car as she was trying to get out of the passenger's side. I believe I struck her twice. I think I shot her in the left side. She then got out of the car and ran about twenty feet across the parking lot and fell on her left side. I then ran over to her and held her and tried to talk to her, but she was unconscious. Then I just ran over to my car and took off.

On the night of his arrest, Albury's family retained Arlen Mekler ("Mekler") to represent him. On January 21, 1980, Albury was indicted by a Sussex County Grand Jury on charges of murder in the first degree pursuant to 11 *Del. C.* § 636(a)(1), and possession of a deadly weapon during the commission of a felony pursuant to 11 *Del. C.* § 1447(a).

Albury's trial was scheduled to begin on April 14, 1980. Prior to that date, Mekler, on behalf of Albury, had entered into plea negotiations with the prosecutor, Merritt Burke, III ("Burke"). Mekler sought a reduction in the homicide charge or an agreement by the State not to seek the death penalty. Burke refused to offer a plea to a reduced homicide charge. However, Burke did agree that the State would not seek the death penalty and would dismiss the weapons charge, in exchange for Albury's guilty plea, as charged, to murder in the first degree.

Mekler explained the State's proposal to Albury. Albury decided to accept that "plea bargain." On the date set for his trial, Albury entered a plea of guilty to murder in the first degree. Following the acceptance of Albury's guilty plea, the trial court held a penalty hearing. In accordance with the "plea bargain," the State did not present any evidence at that hearing which would warrant the imposition of a death penalty. At the conclusion of the penalty hearing, the trial court concluded that there was no proof of any statutory aggravating circumstance which would warrant the imposition of the death penalty. Accordingly, Albury was sentenced to life in prison without probation or parole.

### Postconviction Motion to Withdraw Guilty Plea

On December 14, 1984, Albury filed a motion for postconviction relief, seeking to withdraw his guilty plea.[3] An evidentiary hearing, consisting of four days of testimony, was held between July 17, 1985 and August 21, 1985. Eleven witnesses testified, including Albury, various members of Albury's family, Albury's original defense attorney, the prosecutor, the chief investigating officer in the case, and a medical doctor who had conducted a psychiatric evaluation of Albury in 1980 pursuant to a court order and who also performed a postconviction evaluation of Albury in 1985. The motion was denied by the Superior Court on June 23, 1987. The evidence presented at the hearing on Albury's postconviction motion is the focus of this appeal.

### Hearing on Postconviction Motion

Albury's motion for postconviction relief alleged that Mekler failed to clearly and fully explain to him the nature and consequences of having a trial and the nature and consequences of entering his guilty plea. Albury contended that Mekler failed to make an adequate factual investigation, in particular, with respect to the evidence surrounding the possible defense of extreme emotional distress. Albury also claimed that Mekler failed to apprise him of the pertinent law which precluded the imposition of multiple punishment for a weapon offense and an underlying felony. *See Hunter v. State*, Del.Supr., 420 A.2d 119 (1980)[4]. Mekler testified at the hearing which was held on Albury's motion for postconviction relief. According to Mekler, all relevant aspects of the case, both factual and legal, were reviewed with Albury.

Mekler stated that he met with Albury for the first time not long after Albury's arrest. During that interview, Albury told Mekler that he had gone to the DuPont parking lot, with a loaded gun, to wait for Layton. Albury also advised Mekler that

---

**3.** The record reflects that Albury contacted the Public Defender's Office in January of 1983 for representation. The Public Defender's Office commenced an investigation prior to filing Albury's Motion for Postconviction Relief. The Superior Court considered this delay in denying Albury's motion. *Allen v. State*, Del.Supr., 509 A.2d 87, 89 (1986).

**4.** This case was vacated and remanded by the United States Supreme Court, *Delaware v. Hunter*, 450 U.S. 991, 101 S.Ct. 1689, 68 L.Ed.2d 90 (1981), and reversed on remand by the Delaware Supreme Court, *Hunter v. State*, Del.Supr., 430 A.2d 476, *cert. denied*, 454 U.S. 971, 102 S.Ct. 519, 70 L.Ed.2d 390 (1981).

he had consumed alcoholic beverages and smoked marijuana prior to shooting Layton. Albury admitted to Mekler that he had "beaten" Layton on three or four prior occasions. Albury also told Mekler that he had threatened Layton's life. Albury denied that those threats were serious.

Mekler testified that subsequent to his initial interview, he appeared with Albury on December 26, 1979, in the Court of Common Pleas, for a preliminary hearing. The preliminary hearing was waived. However, Mekler asked the Judge to order psychiatric and psychological examinations to determine if Albury suffered from any mental illness or defect at the time of the homicide or which would affect his mental competency to stand trial. The Judge ordered those examinations in accordance with Mekler's request.

When those examinations were subsequently completed, the results were a conclusion that there was no evidence of any mental illness and that Albury was competent to stand trial. The reports of the mental examinations did not expressly address the issue of whether or not Albury was suffering from "extreme emotional distress" at the time of the shooting. Mekler stated that he reviewed with Albury the results of the 1980 psychiatric and psychological evaluations. Mekler also testified that he discussed the defense of extreme emotional distress with Albury.

Mekler testified that the prosecutor assigned to Albury's case, Burke, adopted an "open file" policy. Burke provided Mekler with a copy of the police report, Albury's statement, the autopsy report, and all statements obtained from potential State witnesses. Burke also agreed that Mekler could interview the investigating police officers. Mekler stated that he did interview Detective Ralph Mitchell ("Mitchell"), of the Delaware State Police. Mekler also spoke with Mitchell by telephone about the case. Mekler testified that he did not interview any of the State's witnesses who were identified in the police report.

The autopsy result which was given to Mekler by the State revealed that, at the time of her death, Layton was in an early stage of pregnancy. Mekler stated that he told Albury of Layton's pregnancy as soon as he learned of it. Albury was not previously aware of Layton's pregnancy. The statutory list of aggravating factors which permit a jury to impose the death penalty include the pregnancy of the victim. 11 *Del. C.* § 4209(e)(1)p. In Albury's case, the State concluded that it would ask the jury to impose the death penalty.

Mekler stated that he discussed with Albury all of the information provided to him by Burke and the police. Mekler advised Albury that the State intended to seek the death penalty. Mekler testified that he discussed with Albury the applicable procedures for the imposition of the death penalty. Mekler testified that the possibility of a death penalty was Albury's "overriding concern."

According to Mekler, he tried to dissuade Burke from seeking the death penalty. Mekler also tried to persuade Burke to offer Albury a plea to a reduced homicide charge. In support of these requests, Mekler stated that he advised Burke of the possibility that extreme emotional distress could be asserted as a defense. Mekler testified that Burke remained adamant in his decision to seek the death penalty, if Albury's case went to trial.

Mekler testified that he kept Albury regularly informed of the plea negotiations which he was conducting with Burke in the case. Based upon Albury's statements, Mekler believed that the evidence would support a finding that Albury was "lying-in-wait" for Layton. Mekler testified that although extreme emotional distress could arguably have been asserted, he concluded that it was not a plausible defense based on the facts of this case.[5] Mekler testified that, therefore, based upon all of the circumstances in the case, it was his opinion that imposition of a death sentence was a "substantial likelihood" if the case went to trial. Mekler advised Albury of that conclusion. Mekler stated that Albury agreed with his assessment of the case and decid-

---

**5.** He did not talk with either a psychologist or a     psychiatrist before reaching this conclusion.

ed to plead guilty to avoid the possible imposition of the death penalty.

Burke also testified at the hearing on Albury's motion for postconviction relief. Burke confirmed Mekler's statements. Burke stated that he felt the State's case against Albury was "very strong" because of the prior acts of violence against Layton by Albury and because of the "apparent lie-in-wait" situation. Burke testified that he would not offer a reduced plea to manslaughter based on extreme emotional distress because he was confident that he could convince a jury not only to convict Albury as charged, but also to recommend a sentence of death. Burke recalled that he had described to Mekler the facts of another case where he had obtained a first degree murder conviction, when a claim of extreme emotional distress had been asserted, in circumstances which were similar to Albury's. Nevertheless, Burke stated that he finally agreed not to seek the death penalty and to dismiss the weapon's charge,[6] if Albury would plead guilty, as charged, to murder in the first degree. Burke added that he felt "hammered" by Mekler's efforts on Albury's behalf.

Albury's mother and sister, Betty, testified at the hearing. They stated that they had discussed Albury's case with Mekler prior to the entry of the guilty plea. Albury's mother testified that she did not recall Mekler ever discussing any aspect of the case in detail with the family. However, Betty Albury took notes during conversations with Mekler in January and March of 1980. She recalled discussing with him, on various occasions, a possible change of venue, the defense of extreme emotional distress, the content of prosecution witness testimony, the death penalty, the guilty plea, and possibilities for a pardon. She testified that Albury and the family told Mekler to do anything to avoid the death penalty and that they all believed that the outcome of a trial would be worse than a guilty plea. She stated that the family relied upon Mekler to advise Albury. She said the family left the ultimate decision to enter a guilty plea up to Albury and Mekler.

Albury testified at the hearing on his motion for postconviction relief. He acknowledged that Mekler did review with him, at least to some extent, the contents of the police report and his written statement to Detective Mitchell. However, Albury stated that Mekler never provided him with a copy of those materials to read. He also indicated that Mekler never informed him of the outcome of the mental evaluations which were conducted. He stated that Mekler never discussed with him any legal issues which existed in the case, nor any possible defenses which could be raised, including the defense of extreme emotional distress.

Albury testified that Mekler never told him anything about any plea negotiations which were going on in his case. Albury admitted that Mekler had mentioned something about the availability of a death sentence at some point in the case. However, Albury indicated he was not really concerned that a death sentence might result from a trial and that he did not know why a death sentence was an available penalty.[7] Albury stated that he did not really understand that a sentence of death could have been imposed until the day of his plea.

### Standard of Review

Albury's motion to withdraw his guilty plea is governed by Superior Court Criminal Rule 32(d). That rule permits withdrawal of a guilty plea *after* sentencing *only* "to correct manifest injustice." Super.Ct.Cr.R. 32(d). "The burden of proving manifest injustice is on the defendant." *State v. Insley*, Del.Supr., 141 A.2d 619,

6. The Superior Court concluded that Albury's overriding concern was to avoid the death penalty. Therefore, it found that the issue of multiple sentencing for the weapon's charge was an insignificant portion of the plea bargaining process.

7. Albury also testified that he did not become aware that Layton was pregnant at the time of her death, until Detective Mitchell testified at the penalty hearing following the entry of his plea. He also stated that Mekler never reviewed with him the requirements and procedures for imposition of a death sentence.

622 (1958). For relief to be granted, Albury must establish that his plea was either "not voluntarily entered or was entered because of misapprehension or mistake" as to his legal rights. *Id.* The decision whether to grant the motion "rests in the sound discretion of the trial court, and is reviewable only for abuse of discretion." *Id.*

### Sixth Amendment

*Ineffective Assistance of Counsel Claim*

■ Albury's first argument is that his guilty plea was obtained in violation of his Sixth Amendment right to effective assistance of counsel. In order to prevail under the Sixth Amendment on the grounds of ineffective assistance of counsel, "the defendant must show that counsel's representation fell below an objective standard of reasonableness," and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 2065, 2068, 80 L.Ed.2d 674 *reh'g denied,* 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984). *See also Stevenson v. State,* Del.Supr., 469 A.2d 797, 799 (1983). The two-part test which was articulated in *Strickland* has specifically been held to apply to guilty plea challenges based on a claim of ineffective assistance of counsel. *Hill v. Lockhart,* 474 U.S. 52, 58, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985). Accordingly, Albury's claim for postconviction relief must be evaluated by the standards set forth in *Strickland.*

The Superior Court judge who conducted the hearing on Albury's motion had the opportunity to hear the evidence and evaluate the credibility of the witnesses. The judge also reviewed the transcript of the proceedings when Albury entered his plea of guilty.[8] That judge accepted Mekler's

---

8. The plea colloquy included the following statements:

> MR. MEKLER: Your Honor, I have had extensive discussions with Mr. Albury, and he has had an opportunity to discuss this case with me and his family. The State correctly indicates the intention of Mr. Albury.
>
> He understands that he has a right to a speedy trial, that at trial he would have a presumption of innocence, and that he would have had to have been found guilty by a jury beyond a reasonable doubt by a unanimous finding. He understands further that at the trial he would have had the assistance of counsel to cross-examine all of the State's witnesses, that he would have had the assistance of counsel to present his own witnesses and his own evidence, that he would have a right to testify on his own behalf and to raise all of the defenses that are available under the Delaware Criminal Code, and if he chose not to testify, that that fact could not be used as evidence of his guilt.
>
> He further understands that by entering the plea to Count One, he waives all of these trial rights and that it would be as if he were found guilty, and that he would then be subject to the next step, sentencing by the Court to the life sentencing.
>
> There have been no improper promises or threats made to Mr. Albury, either by myself or by the State or anybody involved in the case. He, I believe, enters the plea intelligently and voluntarily.
>
> THE COURT: All right, you have heard your counsel outline the various rights that you have, which includes your right to a speedy

> trial by the Court or by a jury? You realize you have that right?
> THE DEFENDANT ALBURY: Yes.
> THE COURT: You waive that right by entering a plea of guilty. You understand the nature of the charges against you? You are charged with intentionally causing the death of Susan L. Layton by shooting her with a .22–caliber pistol. Do you understand that?
> THE DEFENDANT ALBURY: Yes.
> THE COURT: That is what you are pleading guilty to?
> THE DEFENDANT ALBURY: Yes.
> THE COURT: Has your plea been induced by any promises or any threats? Has anybody promised you anything or threatened you with anything to make you enter this plea?
> THE DEFENDANT ALBURY: No.
> THE COURT: You are entering it voluntarily?
> THE DEFENDANT ALBURY: Yes.
> THE COURT: You understand that the sentence for first-degree murder is either a sentence of life without probation or parole or a sentence of death by hanging? Do you understand that?
> THE DEFENDANT ALBURY: Yes.
> THE COURT: Do you understand that, while the State has indicated they are not going to pursue the death penalty, that that is not binding upon me? Do you understand that?
> THE DEFENDANT ALBURY: Yes.
> THE COURT: We will have to have a penalty hearing to decide what penalty to impose. Do you understand that?
> THE DEFENDANT ALBURY: Yes.
> THE COURT: Have you discussed this matter fully with Mr. Mekler?

testimony and found that there was no "cause" for Albury's claim of ineffective assistance of counsel because Mekler's investigation and discussions with Albury were adequate. Moreover, in reviewing the evidence and testimony of the witnesses, the trial judge found no "prejudice" to Albury because:

> [E]ven if the Court accepts Albury's contentions that Mr. Mekler should have done more in his behalf, I find that Albury has failed to show prejudice or that he would not have pled guilty to murder in the first degree in order to obtain the benefit of the State's agreement not to pursue the death penalty. The Court does not find credible Albury's present testimony that he would have insisted upon a trial had Mr. Mekler done more. In assessing his testimony, I have considered the record of the plea colloquy, Mr. Mekler's testimony, Albury's demeanor at the hearing, and the delay—which is attributable to Albury—in raising this claim. *Compare Allen v. State,* Del.Supr., 509 A.2d 87 (1986). Albury's overriding concern was the avoidance of the death penalty. Given the facts and circumstances of this case, his concern was appropriate and evidences an intelligent understanding of his situation. I am satisfied his concern about the death penalty would have continued unabated and still would have provided Albury the motivation to plead guilty even if Mr. Mekler had done all that Albury now argues he should have as defense counsel.

> Even with the benefit of all the information now available to Albury's present defense counsel, a competent criminal defense lawyer would have still advised Albury of the apparent weakness of his claim of extreme emotional distress on the facts of this case.

■ The United States Supreme Court has observed that "[i]n many guilty plea cases, the 'prejudice' inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective assistance challenges to convictions obtained through a trial." *Hill v. Lockhart,* 474 U.S. at 58, 106 S.Ct. at 370. Where the alleged error of counsel is a failure to investigate, a determination of "prejudice" to the defendant by causing him to plead guilty depends upon the likelihood that the additional effort by counsel would have led to a change in counsel's recommendation as to that plea. *Id.* at 58–59, 106 S.Ct. at 370–371. The Superior Court applied that test and concluded that even if Mekler had done more, Mekler would have recommended the same guilty plea and Albury would not have insisted upon a trial. "Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial." *Id.* at 59, 106 S.Ct. at 371 (citing *Evans v. Meyer,* 742 F.2d 371, 375 (7th Cir.1984)). The Superior Court applied this test and found that a defense based upon extreme emotional distress would be weak and unlikely to succeed.

The Superior Court applied the analytical model set forth in *Hill* with precision in its examination of the facts and circumstances leading to the entry of Albury's guilty plea. It determined that Albury had not established the "cause and prejudice" which were prerequisites to finding a violation of his Sixth Amendment right to counsel under *Strickland.* Therefore, the Superior Court concluded that Albury had not sustained his burden of proving that it would be a "manifest injustice" not to permit the withdrawal of his guilty plea.

■ When an appellate court examines the representation of counsel pursuant to the first prong of the *Strickland* test, that review is subject to a strong presumption that counsel's conduct was professionally reasonable. *Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. at 2065. That presumption is designed to eliminate the distorting effects of hindsight. *Id.* In con-

THE DEFENDANT ALBURY: Yes.
THE COURT: He has explained your rights to you in detail? He has explained to you the consequences of this plea?

THE DEFENDANT ALBURY: Yes.

sidering the second prong of the *Strickland* test, the required showing of "prejudice," the defendant must demonstrate to the appellate court, in the context of a guilty plea challenge, "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. at 58, 106 S.Ct. at 370.

This Court will not disturb conclusions of fact made by the trial judge which are supported by competent evidence. *State v. Rooks*, Del.Supr., 401 A.2d 943, 949 (1979); *Martin v. State*, Del.Supr., 433 A.2d 1025, 1032–33 (1981), *cert. denied*, 454 U.S. 1151, 102 S.Ct. 1018, 71 L.Ed.2d 306 (1982); *Harris v. State*, Del.Supr., 305 A.2d 318, 319 (1973). It has also long been the law of Delaware that the trier of fact "is the sole judge of the credibility of the witnesses and responsible for resolving conflicts in the testimony." *Tyre v. State*, Del.Supr., 412 A.2d 326, 330 (1980).

We have carefully examined the record. We find that competent evidence exists to support the findings of fact and conclusions of law by the Superior Court. We find no abuse of discretion in denying Albury's motion for postconviction relief based upon the alleged violation of his Sixth Amendment right to counsel.

### Due Process

### Ineffective Assistance of Counsel Claim

■ Albury has raised an alternative challenge to his guilty plea which is also based upon an underlying claim of ineffective assistance of counsel. Albury contends that the deficiencies of his attorney's representation resulted in a deprivation of due process. This claim by Albury is separate and distinct from the alleged violation of Albury's Sixth Amendment right to counsel.

Under the Sixth Amendment, "[a]ctual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant *affirmatively prove prejudice.*" *Strickland v. Washington*, 466 U.S. at 693, 104 S.Ct. at 2067.[9] (emphasis added.) However, Albury argues that once he establishes a violation of due process, "prejudice" need not be demonstrated, and it should be presumed as a matter of law.[10] In effect, Albury's alternative argument is an effort to circumvent the "prejudice" requirement of *Strickland*. However, the United States Supreme Court has clearly stated, in general terms, that the "prejudice" test of *Strickland* applies "to challenges to guilty pleas based upon ineffective assistance of counsel." *Hill v. Lockhart*, 474 U.S. at 58, 106 S.Ct. at 370. We interpret that holding to apply to *all* challenges to guilty pleas based upon ineffective assistance of counsel regardless of whether the claim is raised under the Sixth Amendment or the Due Process Clause.[11]

Therefore, we conclude that Albury cannot avoid the showing of "prejudice" which

9. In the context of guilty pleas, the required showing of "prejudice" has been said to "serve the fundamental interest in the finality of guilty pleas." *Hill v. Lockhart*, 474 U.S. at 58, 106 S.Ct. at 370.

10. There are circumstances within the Sixth Amendment context where prejudice is presumed, such as where there has been a complete denial of counsel at a critical stage of the proceedings; *U.S. v. Cronic*, 466 U.S. 648, 659, 104 S.Ct. 2039, 2047, 80 L.Ed.2d 657 (1984); *see also Geders v. U.S.*, 425 U.S. 80, 91, 96 S.Ct. 1330, 1337, 47 L.Ed.2d 592 (1976); *Herring v. New York*, 422 U.S. 853, 865, 95 S.Ct. 2550, 2557, 45 L.Ed.2d 593 (1975); where there has been government interference such that the "surrounding circumstances [make] it so unlikely that any lawyer could provide effective assist-

ance" of counsel; *U.S. v. Cronic*, 466 U.S. at 661, 104 S.Ct. at 2048 (discussing *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932)); and when counsel continues representation, notwithstanding an actual conflict of interest. *Strickland v. Washington*, 466 U.S. at 692, 104 S.Ct. at 2067 (citing *Cuyler v. Sullivan*, 446 U.S. 335, 345–350, 100 S.Ct. 1708, 1716–1719, 64 L.Ed.2d 333 (1980)). This Court does not consider the facts of this case to fall into any of the aforementioned categories.

11. The Delaware Constitution provides in part that an accused in a criminal prosecution "shall not be compelled to give evidence against himself, nor shall he be deprived of life, liberty or property, unless by the judgment of his peers or by the law of the land." Del. Const. art. I, § 7. "The phrase 'due process of law' in the federal

is required by *Strickland* and *Hill.*[12] Although Albury has set forth his alternative argument in terms of due process, the underlying claim remains ineffective assistance of counsel. Such claims are controlled by the *Strickland* and *Hill* mandate that there be a demonstration of "prejudice." The Superior Court found no prejudice. That conclusion is supported by the record. Accordingly, we find that the Superior Court properly denied Albury's claim that the alleged deficiencies of his trial attorney resulted in a denial of due process.

### Prosecutorial Discretion to Charge

Albury's final argument on appeal is that he was denied due process because of the prosecutor's refusal to offer a reduced plea to the charge of murder in the first degree. Albury contends that the prosecutor's refusal was based upon arbitrary policies which amounted to an abuse of prosecutorial discretion in the context of plea negotiations.

■ In our criminal justice system, the State has broad discretion as to whom to prosecute. *Wayte v. United States,* 470 U.S. 598, 607, 105 S.Ct. 1524, 1530, 84 L.Ed. 2d 547 (1985). "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision of whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Id.* (quoting *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 *reh'g denied,*

435 U.S. 918, 98 S.Ct. 1477, 55 L.Ed.2d 511 (1978)).[13] The United States Supreme Court has also recognized that this broad, but not unlimited, prosecutorial discretion also extends into the process of plea bargaining. *Bordenkircher v. Hayes,* 434 U.S. at 363–65, 98 S.Ct. at 667–69. The Court concluded in *Bordenkircher* that,

"the conscious exercise of some selectivity in enforcement is not itself a federal constitutional violation" so long as "the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification."

*Id.* at 364–65, 98 S.Ct. at 668–69 (quoting *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962)). *See also Ward v. State,* Del.Supr., 414 A.2d 499, 500 (1980); *Bailey v. State,* Del.Supr., 450 A.2d 400, 405 (1982).

■ In this case, Burke, the prosecutor testified that it was his custom to examine a case closely prior to seeking an indictment. If he determined that a charge of first degree murder was appropriate, he would seek such an indictment. Burke stated that it was not his policy to "overindict" cases for the purpose of subsequent plea bargaining. Burke testified that it was his policy to plea bargain following an indictment of murder in the first degree only if the State needed a co-defendant's testimony or if the State determined that one person's culpability in the crime was far less than that of another. In this case, Burke testified that he did not offer a

---

Constitution and the phrase 'law of the land', as used in the State Constitution have substantially the same meaning." *Goddard v. State,* Del. Supr., 382 A.2d 238, 240 n. 4 (1977) (citing *Opinion of the Justices,* Del.Supr., 246 A.2d 90 (1968)). "While the State provision may not be interpreted to provide less rights to criminal defendants than those mandated by the Federal provision, it may be interpreted so as to provide greater rights." *Id.*

**12.** The case law which Albury cites in support of his Due Process argument, precedes but nonetheless comports with the requirements of *Strickland,* i.e., the defendants were merely successful in carrying their burden of proving prejudice. *See e.g. Via v. Superintendent, Powhatan Correctional Center,* 643 F.2d 167 (4th Cir.1981)

(evidence that attorney retained by criminal defendant three days prior to trial conducted no investigation until morning of trial and admitted unpreparedness established prejudice enabling collateral attack on guilty plea).

**13.** Nevertheless, prosecutorial discretion is not unlimited. *Wayte v. United States,* 470 U.S. at 608, 105 S.Ct. at 1531. However, abuses of prosecutorial discretion in this area of the law generally involve either selective prosecution, which is a denial of equal protection, or vindictive prosecution, a violation of due process. *See id.* at 608–09, 105 S.Ct. at 1531–1532; *Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 707 n. 4, 106 S.Ct. 3172, 3178 n. 4, 92 L.Ed.2d 568 (1986); *Blackledge v. Perry,* 417 U.S. 21, 28–29, 94 S.Ct. 2098, 2102–2103, 40 L.Ed.2d 628 (1974).

reduced homicide plea because he viewed the evidence against Albury as a "classic" case of first degree murder due to the element of premeditation.

Burke stated that he did not make the decision to seek the death penalty in Albury's case or any other case until there was additional investigation following the indictment. Burke testified that he decided to seek the death penalty because of Albury's prior acts of violence against the victim, Layton's pregnancy, and because Albury had purchased a gun and "laid-in-wait" to kill Layton. Burke testified that he did not believe the defense of extreme emotional distress was viable and that he had previously obtained convictions for murder in the first degree, in similar circumstances, when such a defense had been raised.

In examining claims of prosecutorial abuse in this area of the law, courts have recognized a rebuttable presumption that criminal prosecutions are undertaken in good faith and in a nondiscriminatory manner. *See United States v. Saade,* 652 F.2d 1126, 1135 (1st Cir.1981), *quoted in Tracey v. United States,* 739 F.2d 679, 682 (1st Cir.1984), *cert. denied,* 469 U.S. 1109, 105 S.Ct. 787, 83 L.Ed.2d 781 (1985). *See also United States v. Hoover,* 727 F.2d 387, 389 (5th Cir.1984) (Defendant must satisfy two-prong test, prima facie showing of selective prosecution and invidious discrimination by the government before burden shifts to government to demonstrate legitimate basis for prosecution). However, the application of that presumption is unnecessary in this case. After hearing Burke's testimony, the Superior Court stated:

> The court has carefully reviewed the testimony of the prosecutor wherein he explained why he exercised his discretion as he did. He found this case to be a "classical case of first degree murder" with elements of premeditation and lying-in-wait to kill and a statutory aggravating circumstance—pregnancy of the victim. I find no unconstitutional exercise of prosecutorial discretion.

We find that the record supports the conclusion that the State's charges against Albury were brought in good faith and that the plea bargaining process was conducted in a nondiscriminatory manner.

### Conclusion

The decision of the Superior Court denying Albury's motion for postconviction relief is AFFIRMED.