**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

STATE OF DELAWARE,          :
                            :      ID Nos. 2010012644 A/B

v.                             :
                            :

DEVIN COLEMAN,          :
                            :

          Defendant.      :

Submitted:  February 11, 2025
Decided:    April 7, 2025

**ORDER**

On this 7th day of April 2025, after considering Defendant Devin Coleman's motion for postconviction relief, the Commissioner's Report and Recommendation (the "Report"), the State's response, and the record, it appears that:

1.      On October 29, 2021, a jury found Mr. Coleman guilty of one count of Possession of a Controlled Substance. On November 1, 2021, the same jury found him guilty of one count of Possession of a Firearm by a Person Prohibited. After a presentence investigation, the Court sentenced Mr. Coleman to forty-five years of incarceration, suspended after twenty-nine years, followed by one year work release, to be followed by further community supervision.

2.      Mr. Coleman then filed a timely direct appeal to the Delaware Supreme Court. On January 3, 2023, the Delaware Supreme Court affirmed Mr. Coleman's conviction.[1] Next, Mr. Coleman filed the present motion for postconviction relief *pro se* and the Court appointed counsel to represent him. His attorney then amended his motion, and the parties fully briefed the matter.

---

[1] *Coleman v. State*, 289 A.3d 619 (Del. 2023).

3. After considering the parties' positions, the Commissioner issued her findings and recommendations in the Report attached as Exhibit A. In the Report, she explained why Mr. Coleman failed to demonstrate that his counsel was ineffective.

4. After she issued her Report, neither party filed written objections as permitted by Superior Court Criminal Rule 62(a)(5)(ii).[2] Accordingly, the Court accepts her findings and recommendations as required by Rule 62 (a)(5)(iv).

**WHEREFORE**, for the reasons stated in the Report dated January 28, 2025, and after receiving no objections to the Report, the Court **ACCEPTS** the attached Commissioner's Report and Recommendation in its entirety. Defendant Devin Coleman's motion for postconviction relief is therefore **DENIED**.

**IT IS SO ORDERED.**

/s/ Jeffrey J Clark
Resident Judge

oc:  Prothonotary
cc:  The Honorable Andrea M. Freud
     Stephen Welch, DAG
     Megan Davies, Esquire (Rule 61 Counsel)
     Trial Counsel

---

[2] The Commissioner issued the Report on January 28, 2025. Pursuant to Rule 62(a)(5)(ii), any objections were due by February 11, 2025. Neither Mr. Coleman nor the State filed objections.

# Exhibit A

| STATE OF DELAWARE, | : | I.D. No. 2010012644 A/B |
| | : | |
| | : | RK-21-040-626-01 POSS C/SUB |
| v. | : | RK-21-040-627-01 PFBPP PABPP |
| | : | |
| DEVIN COLEMAN, | : | |
| SBI #000434475 | : | |
| Defendant. | : | |
| | : | |

**COMMISSIONER'S REPORT AND RECOMMENDATION**

**Upon Defendant's Motion for Postconviction Relief
Pursuant to Superior Court Criminal Rule 61**

Stephen Welch, Jr., Esq., Deputy Attorney General, Department of Justice, for the State of Delaware.

Megan J. Davies, Esq., for the defendant

FREUD, Commissioner
January 28, 2025

The defendant, Devin Coleman ("Coleman"), was found guilty following a jury trial on October 29, 2021, of one count Possession of a Controlled Substance, He was also found guilty by the same jury, in part B of the case, of one count of Possession of a Firearm by a Person Prohibited (PFBPP) on November 1, 2021. In the part B case, the jury acquitted Coleman of a second Count PFBPP and one count Possession

on Ammunition by a Person Prohibition (PABPP). A presentence investigation was ordered by the Court. On February 14, 2021, the State filed a motion to declare Coleman a habitual offender. The Court granted the motion and sentenced Coleman to a total of 45 years incarceration suspended after serving 29 years for probation, 15 years were minimum mandatory. Through Counsel, Coleman filed a timely appeal to the Delaware Supreme Court. In the appeal, Coleman, raised the following argument, as noted by the Court:

> In this appeal, Coleman raises a single issue: He contends that the Superior Court erred by denying his request for a "missing evidence" instruction thereby depriving him of his right to due process.[3]

The Delaware Supreme Court affirmed Coleman's conviction on January 3, 2023. On May 1, 2023, Coleman, filed a *pro se* Motion for Postconviction Relief in which he raised multiple grounds for relief, including ineffective assistance of counsel he also filed a Motion for Appointment of Counsel. The court appointed Counsel who filed an amended Motion for Post Conviction Relief on April 10, 2024. The Rule 61 Postconviction Motion then proceeded to briefing.

## FACTS

Following are the facts as set forth by the Supreme Court in Coleman's direct appeal.

> In June 2020, Devin Coleman, a convicted felon prohibited from possessing a firearm, was released on probation after completing an 8-year prison sentence. Soon after his release, the police began monitoring Coleman's calls through court-approved telephone wiretaps, as part of a joint contraband investigation by the City of Dover Police and the Delaware

---

[3] Coleman v. State, Del. Supr. No. 83, 2022 at, 8.

State Police. At the time, Coleman, a Level III probationer, lived in Room 117 of the Capitol Inn in Dover.[4]

On July 21 and 22, the police listened to Coleman over the wiretap as he discussed guns and drugs. During the calls on July 21, Coleman expressed a desire to purchase firearms,[5] and, the following day,[6] Coleman was recorded telling associate Antwan Campbell, "I spent $1,700 on guns yesterday."[7]

After Coleman made these incriminating statements, he was observed, on the morning of July 22, 2020, carrying a blue backpack into his motel room at the Capitol Inn. A few minutes later, Coleman went outside to take a call from his friend Kendra Lewis. Lewis, who then arrived by car, was greeted by Coleman and the two walked back into the motel room together. Shortly after that, probation officer Ricky Porter and two other officers knocked on the door with the intention of conducting an administrative search. Hearing the knock, Coleman looked out the window, and Porter asked him to open the door. Lewis, James Ayers, and Shaketah Giles were also in the room. Coleman did not open the door immediately.[8] Instead, he turned to Ayers, who was moving

---

[4] App. to Opening Br.at A370–71.

[5] During the July 21, 2020 calls, Coleman: (i) spoke with an unknown person who told him about handguns for sale, (ii) told his eventual codefendant Marquis Mack that he was going to go look at guns for sale, (iii) told an unknown male that he is going to the place where guns are for sale, and (iv) discussed with Mack the pricing of the guns and that the seller was coming down from Wilmington. Id. at A730–37, A739–40, A742–46, A1210

[6] During the July 22, 2020 calls, Coleman spoke: (i) with an unknown person with whom he attempted to arrange a contraband drug purchase, (ii) with Kendra Lewis and joked that the laundromat does not accept "dope" as payment, and (iii) with associate Antwan Campbell who wanted to purchase a quarter ounce unidentified contraband drug and told Campbell that he spent $1,700 yesterday to purchase guns.

[7] Id. at A835–36, A845, A848.5Id. at A1215–17.

[8] The parties dispute how much time elapsed before Coleman opened the door. On direct examination, Porter testified that Coleman opened the door after "an abnormally long time . . . 45 seconds to a minute. "On cross examination, confronted with his investigative report, Porter testified that he wrote the report on the morning of the search and further testified "I've documented it took Coleman several seconds to open the door[.]" Id. at A881, A925–27,A930

things around, and asked him, "Yo, you good?" and Coleman then opened the door.[9]

Once inside, Porter and the officers found drugs containing Fentanyl. Porter also located the blue backpack that Coleman was seen carrying into the room within the preceding hour. Inside the blue backpack, Porter found (i) one Ruger handgun with a loaded 9mm magazine inserted, (ii) one Smith & Wesson with an unloaded .40 caliber magazine inserted, and (iii) one spare .40 caliber magazine that was unloaded and loose in the backpack. Porter photographed the items "before handling the weapons."[10]

During the evidence collection process, Porter removed the magazines from the Ruger and the Smith & Wesson and confirmed that neither weapon's chamber contained a round. Only the 9mm magazine found in the Ruger contained any ammunition. When he seized the .40 caliber magazines, both of which were unloaded and appeared to be "identical,"[11] Porter did not designate which magazine was found in the Smith & Wesson.

Porter delivered the evidence to the Dover Police Department. The items were then tagged and separately photographed. Later, Detective Nolan Matthews, a Dover Police Department crime-scene investigator, lifted three fingerprints from one of the .40 caliber magazines, an examination of which showed that the prints belonged to Coleman, Mack, and Ayers. These were the only fingerprints found that had any identification value.[12] Because no effort had been made when seizing the evidence to differentiate between the two .40 caliber magazines, there was no way to tell which of the.40 caliber

---

[9] Id. at A1436.

[10] Id. at A897, A943

[11] Id. at A941–42

[12] The analysis revealed no visible fingerprints on either the Smith & Wesson or the Ruger. Fingerprints were found on the 9mm magazine and on one of the bullets in the 9mm magazine, but none produced any identification value. *Id* at A1010–11, A1024.

magazines the fingerprints were lifted from—the magazine found inside the Smith & Wesson or the one that was loose in the backpack.

Based on the wiretap investigation, a Kent County grand jury indicted 29 defendants, including Coleman, on racketeering, drug, and weapons offenses. Separately, Coleman faced additional charges stemming from the search of his motel room, including two charges of possession of a firearm by a person prohibited and one charge of possession of ammunition by a person prohibited. To avoid the prejudice that might attend the jury's learning of Coleman's prior felony conviction and his status as a "person prohibited," the court severed the "person prohibited" charges and held two trials. The same jury heard both cases and much of the separately presented evidence overlapped. To streamline the trial, the first trial was limited to one drug dealing (fentanyl)charge; the State entered nolle prosequisas to eight other charges pending against Coleman. The second trial was limited to two charges of possession of a firearm by a person prohibited and one count of possession of ammunition by a person prohibited.

During the first trial, because Porter could not identify which of the two .40 caliber magazines was in the Smith &Wesson firearm when it was seized, Coleman's counsel requested a missing evidence instruction, stating:

> "[A]t the time the evidence was out of the control of Mr. Coleman and exclusively in the control of the State there was at a minimum negligence in handling it. I believe that if there is evidence that could potentially have exculpatory value for a defendant, and it has been mishandled in a negligent fashion. . . that supports grounds for allowing for the *Lolly-Deberry* type of instruction that there was evidence, there could have been exculpatory value but because of the way it was handled it was no longer there. The jury should be instructed that if the evidence were stamped and it was

8

handled properly that evidence would have been that the fingerprints were found on the magazine that was not in the gun. So, at this point in time, I'm making an application for a *Lolly* type [or]*Deberry* instruction with respect to that issue to be given [in]the jury instructions for the gun issue".[13]

In response, the court agreed to hear further argument after the evidence was received in the second trial.

Thereafter, the jury found Coleman guilty of the lesser-included offense of misdemeanor possession of fentanyl. Then, in the second trial, after the prosecution rested, the court denied Coleman's application for a missing evidence instruction finding no breach of the State's duty to collect or preserve evidence.

Coleman then testified in his own defense that he was lying when he told Campbell that he had spent "$1,700 on guns."[14] According to Coleman, when he entered the Capitol Inn on the morning of July 22, the blue backpack contained a pair of sneakers. Coleman opined that Ayers had deposited the guns and spare magazine into the blue backpack while Coleman was outside talking on the phone with Lewis in the minutes before the probation officer arrived to conduct the search. [15] He also claimed that he only briefly touched the spare .40 caliber magazine on the morning of July 22 when he slid the "clip" across the sink to Ayers and told him to "pick this stuff up."[16]

At the end of the second trial, the jury found Coleman guilty of only one count of possession of a firearm by a person prohibited. Because neither of the counts charging Coleman with possession of a firearm by a person prohibited describes

---

[13] Id. at A1279–80.

[14] Id. at A1439.

[15] On cross examination, Coleman agreed that his "theory [was]that the guns [went] in the backpack after [he] [told] [Ayers] to get that stuff out of the room." Coleman confirmed that he never saw anybody put anything in the backpack

[16] Id. At A 1432-33

9

the firearm—that is, neither count identifies the type of firearm Coleman was alleged to have possessed—we do not know whether Coleman was convicted of possessing the Ruger or the Smith & Wesson firearm.

Before Coleman's trials, the State had filed a motion asking the court to sentence Coleman as a habitual offender under 11 Del. C.§4214(d). The Superior Court granted the motion at Coleman's sentencing hearing. The court then sentenced Coleman to 29 years of unsuspended Level V time for the possession-of-a-firearm-by-a-person-prohibited conviction and a fine for the drug-possession misdemeanor.[17]

## COLEMAN'S CONTENTIONS

In Coleman's Motion for Postconviction Relief, he raises the following grounds for relief:

> (1)      Counsel was ineffective in failing to object to the accomplice liability charge from the "Phase A" trial being incorporated into the "Phase B" trial.

> (2)      Counsel was ineffective for failing to object to the Court's reliance on impermissible factors at sentencing

## DISCUSSION

Under Delaware Law, the Court must first determine whether Coleman has met the procedural requirements of the Superior Court Criminal Rule 61(i) before it may consider the merits of the postconviction relief claims.[18] Under Rule 61, postconviction claims for relief must be brought within one year of the conviction becoming final.[19] Coleman's Motion was filed in a timely fashion, thus the bar of Rule 61(i)(1) does not apply to his Motion. As this is Coleman's initial motion for

---

[17] Coleman v. State, Del. Supr. 83, 2020 at 3-8
[18] Bailey v. State, 588 A.2d 1121, 1127 (Del. 1991)
[19] Super. Ct. Crim. R. 61(i)(1).

10

postconviction relief, the bar of Rule 61(i)(2), which prevents consideration of any claim not previously asserted in a postconviction motion, does not apply either.

Grounds for relief not asserted in the proceedings leading to judgment of conviction are thereafter barred unless the movant demonstrates: (1) cause for relief from the procedural default; and (2) prejudice from a violation of the movant's rights.[20] The bars to relief are inapplicable to a jurisdictional challenge or to a claim that satisfies the pleading requirements of subparagraph (2)(i) or (2)(ii) of subdivision (d) of Rule 61.[21] To meet the requirements of Rule 61(d)(2), a defendant must plead with particularity that new evidence exists that creates a strong inference that the movant is actually innocent in fact of the acts underlying the charges of which he was convicted[22] or that he pleads with particularity a claim that a new rule of constitutional law, made retroactive to cases on collateral review by the United States or Delaware Supreme courts, applies to the defendant's case rendering the conviction invalid.[23] Coleman's Motion pleads neither requirement of Rule 61(d)(2). All of Coleman's grounds for relief are premised on ineffective assistance of counsel. Therefore, Coleman has alleged sufficient cause for not having asserted these grounds for relief at trial and on direct appeal. Coleman's ineffective assistance of counsel's claims are not subject to the procedural default rule in part because the Delaware Supreme Court will not generally hear such claims for the first time on direct appeal. For this reason, many defendants, including Coleman, allege ineffective assistance of counsel in order to overcome the procedural default. "However, this path creates confusion if the defendant does not understand that the

---

20 Super. Ct. Crim. R. 61(i)(3).
21 Super. Ct. Crim. R. 61(i)(5).
22 Super. Ct. Crim. R. 61(d)(2)(i).
23 Super. Ct. Crim. R. 61(d)(2)(ii).

11

test for ineffective assistance of counsel and the test for cause and prejudice are distinct, albeit similar, standards."[24]  The United States Supreme Court has held that:

> [i]f the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that the responsibility for the default be imputed to the State, which may not 'conduc[t] trials at which persons who face incarceration must defend themselves without adequate legal assistance;' [i]neffective assistance of counsel then is cause for a procedural default.[25]

A movant who interprets the final sentence of the quoted passage to mean that he can simply assert ineffectiveness and thereby meet the cause requirement will miss the mark.  Rather, to succeed on a claim of ineffective assistance of counsel, a movant must engage in the two-part analysis enunciated in *Strickland v. Washington*[26] and adopted by the Delaware Supreme Court in *Albury v. State*.[27] The *Strickland* test requires the movant to show that counsel's errors were so grievous that his performance fell below an objective standard of reasonableness.[28] Second, under *Strickland*, the movant must show there is a reasonable degree of probability that, but for counsel's unprofessional effort, the outcome of the proceedings would have been different; that is, actual prejudice.[29]  In setting forth a claim of ineffective assistance of counsel, a defendant must make and substantiate concrete allegations of actual prejudice or risk summary dismissal.[30]  Generally, a claim for ineffective assistance of counsel fails unless both prongs of the test have been established.[31]  However, the showing of prejudice is so central to this claim that

---

24 State v. Gattis, 1995 WL 790961 (Del. Super.)
25 Murray v. Carrier, 477 U.S. 478, 488 (1986).
26 466 U.S. 668 (1984).
27 551 A.2d 53, 58 (Del. 1988).
28 Strickland, at 687.  See Dawson v. State, 673 A.2d 1186, 1190 (Del. 1996)
29  Outten v. State, 720 A.2d 547, 557 (Del. 1998), citing Boughner v. State, 1995 WL 466465 at *1 (Del. Supr.).
30 Strickland, at 687.
31 Id, at 697.

the *Strickland* court stated "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."[32] In other words, if the Court finds that there is no possibility of prejudice even if a defendant's allegations regarding counsel's representation were true, the Court may dispose of the claim on this basis alone.[33] Furthermore, Coleman must rebut a "strong presumption" that trial counsel's representation fell within the "wide range of reasonable professional assistance," and this Court must eliminate from its consideration the "distorting effects of hindsight when viewing that representation."[34]

Moreover, there is a strong presumption that defense counsel's conduct constituted sound trial strategy.[35] In *Harrington v. Richter*,[36] the United States Supreme Court explained the high bar that must be surmounted in establishing an ineffective assistance of counsel claim. In *Harrington*, the United States Supreme Court explained that representation is constitutionally ineffective only if it so undermined the proper functioning of the adversarial process that the defendant was denied a fair trial.[37] The challenger's burden on an ineffective assistance of counsel claim is to show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. It is not enough to show that the errors had some conceivable effort on the outcome of the proceeding. Counsel's errors must be so serious as to deprive the defendant of a fair trial.[38]

---

32 Id.
33 State v. Gattis, 1995 WL 790961 (Del. Super.).
34 Supra, at 689; Wright v. State, 671 A.2d 1353, 1356 (Del. 1996).
35 Id., at 668, 689.
36 Harrington v. Richter, 562 U.S. 86, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)
37 Id, at 791.
38 Id.

Counsel's representation must be judged by the most deferential of standards. The United States Supreme Court cautioned that reviewing courts must be mindful of the fact that unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with his client, with opposing counsel, and with the judge. In light of this strong precedent, I have reviewed the file, considered the Trial Counsel's affidavit, and the arguments of counsel and I conclude that Coleman has failed to meet the burden imposed by *Strickland*. Trial Counsel denies Coleman's allegations. I find Trial Counsel's affidavit and the State's arguments more compelling than Coleman's allegations. I find that Trial Counsel represented Coleman effectively. I will now turn to each of Coleman's claims.

The first issue raised by Coleman is that trial counsel's representation was ineffective because he failed to object to the accomplice's liability charge and from the A phase of the trial being incorporated into the B phase of the trial. As noted previously, the B phase involved firearms charges based on an allegation that defendant, who was a person prohibited, unlawfully possessed two firearms which were found in a backpack in a room where he and James Ayers were arrested by police on July 22, 2020.

Boiled down Coleman's claim is that the jury could have been confused by the fact that the instructions from the A phase were incorporated into the B phase and might have believed that the defendant could be convicted of PFBPP as an accomplice rather than as a principal. This argument fails when one considers the facts. The jury convicted Coleman of one count PFBPP, although he was charged with two counts of PFBPP and there were two firearms found in a book bag. Coleman's fingerprints were found on one of the magazines which was found with the Smith & Wesson Pistol in the book bag. His fingerprints were not found on the Ruger pistol which was also found in the book bag. This fact strongly suggests that

14

the jury convicted the defendant of PFBPP based on actual evidence of possession of the Smith & Wesson pistol – i.e., not on the basis of accomplice ability. If they had convicted him as an accomplice, it would be logical to assume, they would have convicted him of both counts of PFBPP and PABPP as well.

During his testimony in Phase B of the trial, Coleman stated that he walked into the motel room earlier that morning and that he had a pair of shoes - but no guns - in the bookbag. He removed the shoes and threw the bag on the floor. He implied that James Ayers probably put the guns into the book bag while he used the bathroom or while he was outside the room and Trial Counsel suggested the same thing in his Phase B closing argument.[39] Coleman testified that, when he emerged from the bathroom, he supposedly looked at the sink "and the clip was out. This where I touched the clip" - i.e., left his fingerprint on the magazine.[40] Again, if somehow the jury convicted Coleman as an accomplice to James Ayers, it is difficult to see why he was not convicted of two counts of PFBPP. Coleman was convicted of possessing a firearm, not possessing a magazine ("clip") for a firearm.

Additionally, the State did not argue accomplice liability during Phase B of the trial. There was no claim that Coleman was guilty as an accomplice. The jury instructions for the PFBPP charge, further, did not instruct the jurors that they could convict the defendant of this offense as an accomplice.[41] Although jurors had been instructed on accomplice liability in connection with the drug offenses charged in Phase A of the trial, they were specially charged on this type of liability only with regard to the drug offense.[42] The accomplice liability instruction specially referred to the Drug Dealing charge which was at issue in Phase A of the trial.[43] So, although

---

39 Trial Transcript, pp. E132 – E136, E166, E169, F21 – F22, F28
40 Trial Transcript, pp. E135, E168.
41 Trial Transcript, pp. F7 – F9.
42 Transcript, pp. D11 – D13.
43 Id., at p. D12.

the jurors were instructed to incorporate the Phase A jury instructions during their deliberations in Phase B, those instructions did **not** inform them that they could convict the defendant of PFBPP as an accomplice.[44] The instructions from the A Phase of the trial were not incorporated into the B Phase of the trial in a way that would have caused the jury to believe that the defendant could be convicted of PFBPP as an accomplice.

The Court specially noted in a discussion with counsel, prior to closing arguments in the B phase of the trial, – after Trial Counsel raised the issue – that the State was not going to argue accomplice liability with regard to PFBPP charge and that the accomplice liability instructions given in the A phase applied only to the drug offense alleged in Phase A.[45] Trial Counsel agreed that there was nothing in the instructions which said "anything about [an accomplice liability instruction with regard to] the gun."[46] During his closing argument, Trial Counsel informed the jury that the defendant could not be convicted of PFBPP on a theory of accomplice liability.[47]

Coleman argues that trial counsel "attempt [ed] to instruct the jury himself" by telling them the accomplice liability instruction given with regard to the drug felonies did not apply to the PFBPP charges. This is inaccurate. Trial Counsel informed the jury, without objection, what the instructions given by the Court made clear – i.e., that they could not consider accomplice liability in deliberating on PFBPP charges. The trial judge had discussed with counsel, prior to closing argument, that this was the case, and the State was in agreement. No one argued that the defendant could be convicted of PFBPP as an accomplice, and jury instructions

---

44 Trial Transcript, pp. F4 – F10
45 Transcript, pp. E106 – 109.
46 Transcript, at p. E109.
47 Trial Transcript, at pp. F28, F29.

did not permit this. There is absolutely no reason to believe that the jury convicted the defendant of PFBPP as an accomplice.

The second issue raised by Coleman is that the Trial Judge supposedly relied on "impermissible factors" when sentencing the defendant on the PFBPP charge. He cites *Samuel v. State*,[48] a case in which a defendant had been acquitted of Attempted Murder and convicted of a lesser-included offense of Felony Assault. At sentencing, the judge stated his belief that the defendant would have killed the victim if not for the intervention of a correctional officer. In other words, he impermissibly relied upon a fact that the jury had apparently rejected. In Coleman's case, the alleged impermissible factor considered by the Judge at sentencing was that Coleman demonstrated a lack of remorse and a failure to accept responsibility for his actions.

At sentencing, the Judge emphasized that Coleman had an absolute right not to testify in the A phase of the trial, in which he was acquitted of Drug Dealing but convicted of the lesser-included offense of Possession of Fentanyl. However, in the B phase of the case, the defendant took the witness stand and "essentially admitted" that he was a drug dealer. The Court, commenting specifically on the defendant's testimony in the B phase, said that "[t]here was no remorse or acceptance of responsibility in your demeanor when you testified or at any other point in the process." [49]

My review of the transcript and the file leads me to conclude that the State's very detailed and logically argued presentation on the Judge's reasoning is correct and I corporate the State's argument into this opinion. Therefore, I do not find Trial Counsel ineffective because the Trial Judge did not consider impermissible facts at sentencing as clearly laid out by the State.

---

48 694 A.2d 48 (Table) (Del. 1992)
49 Sentencing Transcript, at p. 12.

Turning to the legal argument made by Coleman. He cites to *Samuel v. State*, *supra*, which is distinguishable from Coleman's case. In *Samuel*, as noted, the Court sentenced a defendant on a felony assault charge after the defendant had been acquitted of Attempted Murder by the jury. The sentencing judge said that the victim in the case would probably have been murdered but for the intervention of a correctional officer and proceeded to sentence the defendant to 125 years in prison. In these circumstances, the Supreme Court found that the sentencing judge had relied on an impermissible factor – a fact which had been rejected by the jury – and remanded the case for re-sentencing. On remand, a different judge sentenced the defendant to 98 years in prison.

Coleman's case differs from *Samuel* in that the Court in his case did not rely on an impermissible factor at sentencing. In *Samuel*, the Court cited a fact – an intent to commit murder – which was had been rejected by the jury. In Coleman's case, although the defendant had been acquitted of Drug Dealing in phase A of the trial, he admitted during his testimony in phase B of the trial that he was in fact a drug dealer and was selling drugs during the precise time frame of his arrest – i.e., July 21st and 22nd of 2020. In other words, despite the jury's finding in the A phase of the trial, trial evidence including the defendant's own testimony established that he was a drug dealer at the time of his arrest. The Court's point was that his testimony demonstrated a shameless lack of remorse for his actions, and the Court's comment had a clear factual basis. The Court emphasized, it should be added, that the defendant had the right not to testify in phase A of the trial, and that "there was absolutely nothing inappropriate" about his decision not to testify.[50] In other words, the Court in making its sentencing decision took into account the defendant's lack of remorse for his actions, not his failure to testify during phase A of the trial. And,

---

50 Sentencing Transcript, at p. 12

given the defendant's own admissions, the Court's comments were not predicated upon a factual finding which was inconsistent with the evidence in the case – even if the jury had found the defendant not guilty of Drug Dealing with regard to the specific drugs found in the motel room on July 22nd.

As laid out by the State in its reply brief, the Court also cited other evidence of the defendant's lack of remorse and acceptance of responsibility for his actions. Lack of remorse is a SENTAC aggravating factor, and the Court was entitled to consider the defendant's lack of remorse in imposing sentence.[51]

It bears noting that, although the Court did not frame its actions at sentencing in quite this way, a judge is within his authority to consider a defendant's perjury when imposing sentence. *Fuller v. State*,[52] citing *U.S. v. Dunnigan*,[53]. The Trial Judge certainly could have considered that portions of the defendant's testimony amounted to perjury – specifically, his claim not to have possessed the drugs which the jury convicted him of possessing, as well as his claim not to have possessed the gun which the jury convicted him of possessing. To the extent that the judge considered these factors, his behavior was entirely proper. Perjured testimony, of course, may well indicate a lack of remorse.

## CONCLUSION

After reviewing the record in this case, it is clear that Coleman has failed to prove his trial counsel was ineffective. I therefore recommend the Coleman's Motion be denied.

/s/Andrea M. Freud
Commissioner

AMF/pdb

---

51 See, e.g., *White v. State* 243 A.3d 381, 415 (Del. 2020)
52 860 A.2d 324, 332 (Del. 2004)
53 507 U.S. 87 (1993)

oc:     Prothonotary

cc:     Stephen Welch, Jr., Esquire DAG
        Megan J. Davies, Esq.
        Devin Coleman, JTVCC
        Hon. Jeffery J. Clark