# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| | ) | Def. I.D. # 1512017983 |
| v. | ) | |
| | ) | |
| | ) | |
| DAVID ELDER, | ) | |
| | ) | |
| Defendant. | ) | |

Submitted: August 17, 2023
Decided: September 13, 2023

*Upon Defendant's Motion for Postconviction Relief (R-1)*
*and Request for Evidentiary Hearing*

**DENIED**

## MEMORANDUM OPINION AND ORDER

Casey L. Ewart, Esquire, Deputy Attorney General, Department of Justice, 13 The Circle, Georgetown, DE 19947; Attorney for State of Delaware.

Natalie S. Woloshin, Esquire, Woloshin Lynch & Associates, P.A., 3200 Concord Pike, Wilmington, DE 19803; Attorney for Defendant David Elder.

**KARSNITZ, R. J.**

**Procedural Background**

On December 15, 2017, after a second jury trial,[1] David Elder ("Petitioner" or "Mr. Elder") was convicted of First Degree Rape, Second Degree Rape, First Degree Burglary, and wearing a disguise during the commission of a felony. On January 26, 2018 he was sentenced to life on the first three charges and five years at Level 5 on the last charge. On December 3, 2018, his conviction was upheld by the Delaware Supreme Court on direct appeal.

On December 12, 2018, Mr. Elder filed a *pro se* Rule 61 Motion and a supporting Memorandum. After a delay occasioned by the COVID pandemic and the appointment of Postconviction Counsel, on November 14, 2022, I allowed Mr. Elder to file a *pro se* Supplemental Petition and Appendix (the Rule 61 Motion, the Memorandum, and the Supplemental Petition and Appendix, collectively, the "*Pro Se* Motion"), even though at that time he was represented by Postconviction Counsel.[2]

---

[1] The first trial resulted in a hung jury.

[2] Mr. Elder has filed a number of submissions with the Court despite the fact that he was represented by counsel (e.g., his *pro se* Motion to Amend his Motion for Post-Conviction Relief, which he filed on or about February 1, 2020 despite the fact that Postconviction Counsel had already been appointed on his behalf). I forwarded many of those *pro se* filings on to Postconviction Counsel. In this opinion I will address only those arguments set forth in Postconviction Counsel's Amended Motion for Postconviction Relief, her Reply,, and Mr. Elder's Supplemental Petition and Appendix, permission for the filing of which I specifically granted. Any claims made in prior *pro se* filings by Mr. Elder that were not included in his Supplemental Petition and Appendix I deem to have been waived.

On November 30, 2022, Postconviction Counsel filed an Amended Rule 61 Petition (the "Motion").

On March 27, 2023, Mr. Elder filed a *pro se* request for an evidentiary hearing, which I forwarded to Postconviction Counsel.

The State's Answer was filed on May 30, 2023.

On July 10, 2023, Mr. Elder filed a *pro se* Reply to the State's Answer, which I forwarded to Postconviction Counsel.

The Reply from Postconviction Counsel was filed on August 17, 2023.

The relief that Petitioner seeks in the Motion is that I schedule an evidentiary hearing and/or grant all other appropriate relief. This is my ruling on the Motion.

**The Nine Grounds for Postconviction Relief**

In the Motion, Postconviction Counsel asserts two grounds for postconviction relief. In the *Pro Se* Motion, Mr. Elder asserts seven grounds for postconviction relief. I summarize all nine grounds as follows:

The Motion posits two claims of ineffective assistance of counsel: Trial counsel, Stephen W. Welsh ("Mr. Welsh" or "Trial Counsel") (1) did not effectively argue at trial the motion *in limine* to suppress records of telephone communications between Mr. Elder and his wife (the daughter of his elderly victim) which the State had subpoenaed, because the State provided the trial judge with inaccurate

information regarding the basis for the subpoenas; and (2) failed to raise on direct appeal the trial Court's improper comment on the factual evidence in its jury instructions regarding the burglary charge.

The *Pro Se* Motion asserts seven different allegations, all of which are grounded in claims of ineffective assistance of counsel:

- Mr. Elder received ineffective assistance of counsel because Mr. Welsh failed to move for a mistrial or argue on direct appeal that the trial judge was not impartial (*pro se* claim 1);
- Mr. Elder received ineffective assistance of counsel because Mr. Welsh failed to move for a mistrial or argue on direct appeal that the State engaged in prosecutorial misconduct (*pro se* claim 2);
- Mr. Elder received ineffective assistance of counsel because Mr. Welsh failed to properly cross examine witnesses (*pro se* claim 3);
- Mr. Elder received ineffective assistance of counsel because Mr. Welsh did not challenge the DNA search warrant (*pro se* claim 4);
- Mr. Elder received ineffective assistance of counsel because Mr. Welsh did not challenge the admissibility of certain evidence seized from Mr. Elder's house (*pro se* claim 5);
- Mr. Elder received ineffective assistance of counsel because Mr. Welsh failed to properly question the jury panel during *voir dire* (*pro se* claim 6)
- The cumulative effect of the errors listed above is sufficient to vacate the defendant's convictions and grant him a new trial (*pro se* claim 7).

**Trial Counsel Affidavit**

Mr. Welsh filed his Trial Counsel Affidavit on February 13, 2023. He concedes that he was ineffective in arguing the subpoena issue at trial. He also concedes that he was ineffective in failing to raise on direct appeal the trial Court's comment to the jury on the burglary charge. He further concedes a number of Elder's seven *pro se* claims. The Trial Counsel Affidavit consists mostly of generalized admissions that he could have and should have done a better job in representing Mr. Elder.

In its Answer, the State discusses Mr. Welsh's hands off approach in the Trial Counsel Affidavit. The State argues that TC's "statements in [his] affidavit are not the beginning and end of the inquiry as to trial strategy, as many attorneys may take a hands off approach on Rule 61 affidavits to better protect their former clients' interests."[3] "[E]ven where defense counsel concedes performance deficiency, it is necessary to establish the resulting prejudice in order to satisfy the requisite standard for reversal."[4]

---

[3] *State v. Morris*, 2022 WL 984390, at *5 n.42 (Del. Super. Mar. 31, 2022) (citing *White v. State*, 173 A.3d 78, 81 n.16 (Del. 2017) ("We are aware of legitimate concerns on the part of the state and trial judges that trial counsel sometimes fault their own performance in the Rule 61 context, in situations when their confession of failing to live up to their duties seems strained and inconsistent with the record.").

[4] *Wright v. State*. 513 A.2d 1310, 1315 (Del. 1986) (citing *Duro v. State*, 494 A.2d 1265, 1268 (Del. 1985).

**Procedural Bars**

I first address the four procedural bars of Rule 61.[5]  If a procedural bar exists, as a general rule I will not address the merits of the postconviction claim.[6]  A Rule 61 Motion can be barred for time limitations, successive motions, failure to raise claims below, or former adjudication.[7]

First, a motion for postconviction relief exceeds time limitations if it is filed more than one year after the conviction becomes final.[8]  In this case, Mr. Elder's conviction became final for purposes of Rule 61 when the Delaware Supreme Court issued a mandate or order finally determining the case on direct review; i.e., December 3, 2018.[9]  Mr. Elder filed the *Pro Se* Motion on December 12, 2018, well within the one-year period.  Consequently, the Motion filed by Postconviction Counsel is also timely even though it was filed more than a year after Mr. Elder's convictions became final.  "Rule 61's time limit applies only to the initial filing, and ...  Rule 61 grants Superior Court judges discretion to permit defendants to amend their motions when justice so requires."[10]  Therefore, consideration of the Motion is not barred by the one-year limitation.

---

[5] *Ayers v. State*, 802 A.2d 278, 281 (Del.2002) (citing *Younger v. State,* 580 A.2d 552, 554 (Del. 1990).

[6] *Bradley v. State*, 135 A.3d 748 (Del 2016); *State v. Page*, 2009 WL 1141738, at*13 (Del. Super. April 28, 2009).

[7] Super. Ct. Crim. R. 61(i).

[8] Super. Ct. Crim. R. 61(i)(1).

[9] Super. Ct. Crim. R. 61(m)(2).

[10] *Ploof v. State*, 75 A.3d 811, 821 (Del. 2013), as corrected (Aug. 15, 2013) (citations omitted).

Second, second or subsequent motions for postconviction relief are not permitted unless certain conditions are satisfied.[11]   Since this is Mr. Elder's first motion for postconviction relief, consideration of the Motion is not barred by this provision.

Third, grounds for relief "not asserted in the proceedings leading to the judgment of conviction"[12] or on direct appeal are procedurally barred. Mr. Elder did not raise the impartiality of the trial judge (*pro se* claim 1) or prosecutorial misconduct by the State (*pro se* claim 2) at trial or on direct appeal. Those claims are arguably barred  by Rule 6l(i)(3). The Rule 6l(i)(3) procedural bar also applies "even when ineffective assistance of counsel is asserted, unless the defendant successfully demonstrates that counsel was in fact ineffective and that ineffectiveness prejudiced his rights."[13]  It is well-settled Delaware law that, as collateral claims, ineffective assistance of counsel claims are properly raised for the first time in postconviction proceedings.[14]  Mr. Elder acknowledges at several points in his filings that he is couching all seven of his *pro se* claims as ineffective assistance of counsel

---

[11] Super. Ct. Crim. R. 61(i)(2).
[12] Super. Ct. Crim. R. 61(i)(3).
[13] *Wils on v. State*, 900 A.2d 102 (Table), 2006 WL 1291369, at *2 (Del. May 9, 2006) (citing *Gattis v. State*, 697 A.2d 1174 (Del. 1997)).
[14] *State v. Schofield*, 2019 WL 103862, at *2 (Del. Super. January 3, 2019); *Thelemarque v. State*, 2016 WL 556631, at *3 (Del. Feb. 11, 2016) ("[T]his Court will not review claims of ineffective assistance of counsel for the first time on direct appeal."); *Watson v. State*, 2013 WL 5745708, at *2 (Del. Oct. 21, 2013) ("It is well-settled that this Court will not consider a claim of ineffective assistance that is raised for the first time in a direct appeal.").

7

claims in order to avoid Rule 6l(i)(3)'s procedural bar. This gives rise to a scenario such as the one recently faced by this Court where it observed:

> [C]onstantly in this case, ineffective assistance of counsel is alleged as grounds to avoid a Rule 61(i)(3) bar, thus resulting in the Court having to consider the merits to determine if the ineffective counsel excuse is real. In other words, the mere allegation of ineffective counsel is not sufficient. It must be proven. So, because of ineffective assistance of counsel allegations, the merits of that allegation must be addressed.[15]

Notwithstanding Mr. Elder's transparent attempts in his *pro se* claims to raise issues that could have been raised at trial or on direct appeal, and to avoid Rule 6l(i)(3)'s procedural bar, I will address all seven ineffective assistance of counsel claims under the dual standards of *Strickland v. Washington*[16] and *Albury v. State.*[17]

Fourth, grounds for relief formerly adjudicated in the case, including "proceedings leading to the judgment of conviction, in an appeal, in a post-conviction proceeding, or in a federal *habeas corpus* hearing" are barred.[18]

In Postconviction Counsel's claim 1, Mr. Elder asserts that Mr. Welsh did not effectively argue at trial the motion *in limine* to suppress records of telephone communications which the State had subpoenaed. Before trial, the Court considered and denied Mr. Welsh's motion *in limine* to exclude Mr. Elder's prison phone calls. However, that denial was based upon grounds (marital privilege) other than

---

[15] *State v. Cooke*, 2022 WL 17817903 at *8 (Del. Super. Dec. 15, 2022).
[16] 466 U.S. 668 (1984).
[17] 551 A.2d 53 (Del. 1988), which applied *Strickland* in Delaware.
[18] Super. Ct. Crim. R. 61(i)(4).

those now asserted by Postconviction Counsel (i.e., the State provided me with inaccurate information regarding the basis for the subpoenas), so I will consider this claim.

In *pro se* claim 5, Mr. Elder alleges ineffective assistance of counsel because of Mr. Welsh's failure to challenge the admissibility of certain evidence seized from Mr. Elder's house. However, Mr. Welsh *did* file a Motion to Suppress with respect to the search of the house which was subsequently denied by the Court prior to trial. However, Mr. Elder claims that Mr. Welsh was ineffective because he should have moved to reopen the Motion to Suppress. Thus, although this claim is arguably barred by Rule 6l(i)(4) as formerly adjudicated, I will consider it.[19]

I will also address the two claims of ineffective assistance of counsel raised by Postconviction Counsel in the Motion.

**Legal Standard**

Mr. Elder and Postconviction Counsel bring a total of eight claims based on ineffective assistance of counsel, and a ninth claim of the cumulative effect of those claims. The\se claims are assessed under the two-part standard established in

---

[19] The procedural bars listed in Rule 61(i)(l)---(i)(4) do "not apply either to a claim that the court lacked jurisdiction or to a claim that satisfies the pleading requirements of subparagraphs (2)(i) or (2)(ii) of subdivision (d) of this rule"; however, neither Postconviction Counsel nor Mr. Elder has alleged that either of the exceptions set forth in Rule 61(d)(2) is applicable to any of the claims set forth in their respective submissions.

*Strickland v. Washington,*[20] as applied in Delaware.[21]  Under *Strickland*, Mr. Elder must show that (1) Mr. Welsh's representation "fell below an objective standard of reasonableness" (the "performance prong"); and (2) the "deficient performance prejudiced [his] defense." (the "prejudice prong").[22]  In considering the performance prong, the United States Supreme Court was mindful that "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."[23]  *Strickland* requires an objective analysis, making every effort "to eliminate the distorting effects of hindsight" and to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[24]  "[S]trategic choices about which lines of defense to pursue are owed deference commensurate with the reasonableness of the professional judgments on which they are based."[25]

As to the performance prong, Mr. Elder must demonstrate that Mr. Welsh's failure to (1) argue in the motion *in limine* before trial to suppress the records of prison telephone communications because of an improper basis for the State's subpoenas, (2) raise on direct appeal the trial Court's comment on the factual evidence on the burglary charge to the jury, (3) properly cross-examine witnesses,

---

[20]  466 U.S. 668 (1984).
[21]  *Albury v. State*, 551 A.2d 53 (Del. 1988).
[22]  *Id.* at 687.
[23]  *Id*. at 690.
[24]  *Id.* at 689.
[25]  *Id.* at 681.

(4) challenge the DNA search warrant, and (5) properly question the jury panel during *voir dire*, all as discussed more fully below, were unreasonable decisions.

As to the prejudice prong, Mr. Elder must demonstrate that there exists a reasonable probability that, but for Mr. Welsh's errors, the outcome of the trial would have been different.[26] Even if Mr. Welsh's performance was professionally unreasonable, it would not warrant setting aside the judgment of conviction if the error had no effect on the judgment.[27] A showing of prejudice "requires more than a showing of theoretical possibility that the outcome was affected."[28]

*Strickland* teaches that there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in a particular order, or even to address both prongs of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant because of the alleged deficiencies. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed.[29] In every case, the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a

---

[26] *Albury,* at 687; *Zebroski v. State,* 822 A.2d 1038, 1043 (Del. 2003); *Wright v. State,* 671 A.2d 1353, 1356 (Del. 1996).
[27] *Strickland,* at 691.
[28] *Frey v. Fulcomer,* 974 F.2d 348, 358 (3d Cir. 1992).
[29] *Strickland,* at 697.

breakdown in the adversarial process that our system counts on to produce just results.[30]

**Analysis**

**Claim 1 – Motion -- Failure to Challenge Admissibility of Prison Calls**

At both of Mr. Elder's trials, the State introduced some of the recorded phone calls that he made from prison during the pendency of this case. The State also introduced his prison call logs and visitor logs. The State issued several different Attorney General subpoenas for Mr. Elder's prison calls and visitor logs over the course of this case. This was a result of multiple factors, including the length of time that elapsed between Mr. Elder's arrest and his first trial; the fact that even more time elapsed between his first trial and second trial; and information the State received about his ongoing contact with his wife, Michelle Elder, who was both the daughter of the victim and a witness at both of his trials.

In her papers, Postconviction Counsel summarizes Delaware law on the reasonableness of Attorney General subpoenas, whether issued under 29 *Del. C.* § 2504(4) or 29 *Del. C.* § 2508(a). The Delaware Supreme Court has held:

> [I]n order to lawfully seize a defendant's prison communications, the Attorney General is required to issue a subpoena that is reasonable under the Fourth Amendment. The reasonableness requirement requires a reviewing court to analyze whether: "(1) the contested actions furthered an important or substantial

---

[30] *Id*. at 696.

> government interest ... , and (2) the contested actions were no greater than necessary for the protection of that interest."[31]

In the Motion, Postconviction Counsel argues that Mr. Welsh erred by failing to challenge the reasonableness of the Attorney General subpoena used by the State to obtain the initial batch of Mr. Elder's prison calls to Michelle Elder, which covered the period from December 28, 2015 (the date of his arrest) to early February of 2016. The Motion references an office conference held on June 8, 2017, during which the admissibility of Mr. Elder's prison calls was discussed, and argues that the State offered assertions that were incorrect at best, and misleading at worst, to justify the reasonableness of the subpoena. During that office conference, the State referenced a re-interview with Michelle Elder that had been conducted on February 4, 2016; however, the State issued its subpoena on February 2, 2016, before the re-interview. Therefore, the Amended Motion argues, the reasonableness for the subpoena could not have been the re-interview with Michelle Elder since, at the time of the subpoena's issuance, the re-interview had not yet occurred. Absent the re-interview, there was no basis for the State to obtain recordings of Mr. Eider's incoming and outgoing calls by means of an

---

[31] *State v. Freeman*, 2023 WL 2854771, at *7 (Del. Super. Apr. 9, 2023) (quoting *Whitehurst v. State*, 83 A.3d 362, 367 (Del. 2013)).

Attorney General subpoena.

To address this claim, it is important to examine exactly what the parties were discussing at the June 8, 2017 office conference. Mr. Welsh had attempted to have the contents of the defendant's prison calls to his wife suppressed a few days prior to the first trial by a June 6, 2017 Motion in *Limine*. That Motion, which sought to exclude Mr. Elder's communications with his wife under the spousal privilege set forth in Delaware Rule of Evidence 504, was addressed and denied by the Court in an office conference on June 8, 2017.

The transcript from that office conference shows that the Motion was denied because each call was exposed to a third party under circumstances that Mr. Elder, his wife, and the third party, because of the automated warning before each prison call that the conversation is being monitored and recorded, all knew that it was being exposed to a third party. Thus, Mr. Elder and his wife had no expectation that their communications would remain private.

After learning that his Motion *in Limine* had been denied, Mr. Welsh told the Court that he might have an issue with the reasonableness of the subpoenas, apart from the expectation of privacy issue. The State began to address this issue, including a description of a police interview with Michelle Elder in February 2016 in which she told the police that Mr. Elder had been calling her from prison

and making statements about the pending charges.[9] Before the State could finish its explanation, however, the Court interrupted and indicated to Mr. Welsh that this proffer by the State had established a reasonable basis for subpoenaing the defendant's prison calls.

Postconviction Counsel now asserts with 20-20 hindsight that the State was trying to justify the issuance of its first prison call subpoena on February 2, 2016 based on information that was not obtained until February 4, 2016, and Mr. Welsh was deficient for failing to pick up on that fact. However, the nature and scope of the office conference on June 8, 2017, was quite broad. The Motion *in Limine* being addressed in that office conference, which took place almost 18 months after Mr. Elder's arrest, was not limited solely to prison calls placed during the specific time period covered by the State's first subpoena. Rather, it sought to prevent the State from being able to introduce *any* of Mr. Elder's prison calls with his wife, no matter when they may have occurred. It was in this context that the State was attempting to explain its rationale for obtaining the prison calls. It ultimately turned out that, with one exception, all of the prison call recordings that were introduced during Mr. Elder's two trials came from the time period covered by the State's first subpoena; however, the parties had no way of knowing that this would be the case at the time the admissibility of the prison

calls was discussed on June 8, 2017, and in fact the State issued several more prison call subpoenas as the case progressed.

Even if the parties' conversation had been focused solely on the justification for the State's first subpoena and Mr. Welsh had noticed the date discrepancy now highlighted by Postconviction Counsel, the State would still have been able to provide the Court relevant information *before* February 2, 2016 that would have established a reasonable basis for acquiring the defendant's prison calls. The State had a pre-existing reason for having Michelle Elder come to Troop 4 for an interview on February 4, 2016; it already had reason to believe that she might have new, relevant information about the case and wanted to formally document it. In the interview, the detective discusses when he learned that Mr. Elder had been reaching out to his wife from prison and discussing the case with her. This timeline of events is generally consistent with notes in the State's file from a DOJ social worker documenting her contact with the victim's relatives in the weeks after Mr. Elder's arrest, which indicate that on January 14, 2016, the social worker spoke with the victim's son and Michelle Elder's brother. On January 20, 2016, the social worker spoke with Michelle Elder, who informed her that Mr. Elder had admitted the incident in phone calls. Michelle Elder also told the social worker that she had been to the jail once to see him. This

information, which was in the State's possession approximately two weeks prior to the issuance of the February 2, 2016 subpoena, undoubtedly played a role in its decision to subpoena Mr. Elder's prison calls.[32] If Mr. Welsh had challenged the initial prison call subpoena, the State would have been able to articulate this information to the Court and the motion would have still failed.

By the time Mr. Elder's re-trial began in December 2017, the State was in possession of evidence, from sources other than the prison calls acquired through its first subpoena, that he had been discussing his case with his wife and had been attempting to influence her testimony. During Mr. Elder's first trial, his wife testified on the first and second days of trial. Even though she was a sequestered witness, Mr. Elder called her on the night between those two days and discussed her testimony and the types of questions Mr. Welsh might ask her the next day. The State learned about this phone call, obtained the recording, and brought it to the Court's attention. Similarly, the State met with Michelle Elder multiple times to prepare for each of her husband's trials during the two years this case was pending. During many of those meetings and calls, she provided the State with information about her contacts with Mr. Elder in prison and the subjects that had

---

[32] The Delaware Supreme Court has recognized that "[a]n on-going investigation in one crime and the investigation of a potential subsequent crime, witness tampering, fall within the important government interest of investigating and preventing criminal activity." *Whitehurst v. State,* 83 A.3d 362, 367 (Del. 2013) (citation omitted).

been discussed. The State periodically requested new batches of Mr. Elder's call recordings and visitor logs to gauge the accuracy of some her statements. The State issued several follow-up subpoenas for Mr. Elder's prison calls while this case was pending, as new information came in as time passed.

In the Motion, Postconviction Counsel does not contest the fact that the information provided by Michelle Elder constituted reasonable grounds to subpoena the prison calls. Instead, it raises the issue of timing – when that information was obtained in relation to the issuance of the first subpoena. However, it is undisputed that, at least as of February 4, 2016, the State possessed a reasonable basis to subpoena the calls. Therefore, even if Mr. Welsh had successfully argued during the June 2017 office conference that the first prison call subpoena was improper because of the date on which it was signed, it would have made no difference in the result. The State could have immediately issued a new subpoena for the exact same calls, based on the information it had received during and after the February 4, 2016 interview, and there would have been no successful way for Mr. Welsh to challenge it.

The contents of Mr. Elder's calls would likewise have been admissible at trial to impeach his testimony even if the State were prohibited from using them in its case-in-chief. For all these reasons, the suppression argument now being proposed by the Motion would not have resulted in the exclusion of the prison

calls that were introduced at trial, and Mr. Elder has failed to establish that he suffered any prejudice as a result.

I deny this claim.

## Claim 2 – Motion -- Failure to Appeal Supplemental Jury Instructions

The second claim for relief in Postconviction Counsel's Motion argues that Mr. Welsh was ineffective in failing to raise on direct appeal a comment on the evidence made by the trial judge when he gave a supplemental jury instruction for the Burglary First Degree charge. "Although a defendant is entitled to effective assistance of counsel during an appeal, this does not mean that his attorney must raise every nonfrivolous issue."[33] "The United States Supreme Court has recognized that appellate counsel 'need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal.'"[34] "A defendant can only show that his appellate counsel ineffectively represented him where the attorney omits issues that are clearly stronger than those the attorney presented."[35] "Counsel is entitled to present the appeal based on counsel's independent and professional strategic

---

[33] *Ploof v. State*, 75 A.3d 811, 831-32 (Del. 2013), corrected Aug. 15, 2013 (footnotes omitted).

[34] *Neal v. State*, 80 A.3d 935,946 (Del. 2013) (quoting *Smith v. Robbin*, 528 U.S. 259, 288 (2000)).

[35] *Ploof*, 75 A.3d at 831-32.

judgment."[36] While "'[i]t is still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, ... it is difficult to demonstrate that counsel was incompetent.'"[37]

The initial instruction given to the jury regarding the Burglary First Degree charge stated, in pertinent part, that "[i]n order to find the defendant guilty of burglary in the first degree, you must find the State has proved the following elements beyond a reasonable doubt: One, the defendant knowingly entered or remained in a dwelling. Two, the defendant entered unlawfully meaning he had no legal authority or permission to enter the dwelling …".[38] The jury was also instructed on the lesser-included-offense of Burglary Second Degree (the first two elements of which are identical to Burglary First Degree).[39] During the course of deliberations, the jury submitted a note with the following question regarding the Burglary charge: "[S]ince the defendant had access to the key to the complaining witness's house at any time (it was hanging on a hook), is it lawful and does he have legal authority to enter the house at any time[?]"[40]

Mr. Welsh and the trial judge discussed the proper way to respond to the

---

[36] *State v. Taye*, 2014 WL 785033, at *5 (Del. Super. Feb. 26, 2014), *aff'd*, 2014 WL 4657310 (Del. Sept. 18, 2014) (citing *Scott v. State*, 7 A.3d 471,479 (Del. 2010)).
[37] *Neal,* 80 A.3d at 946 (quoting *Smith*, 528 U.S. at 288)
[38] 2nd Trial Tr. at Dl7.
[39] *Id*. at Dl9-D20.
[40] *Id*. at E5; 2nd Trial Court Ex. 2.

jury's question, and he asked that his objection to the supplemental instruction be noted for the record. The trial judge asked Mr. Welsh "[i]s it true legally, a question of law, that mere access alone to a key does not grant legal authority to use the key?"[41] Mr. Welsh responded, "It's true, Your Honor."[42] The Court subsequently provided the following answer to the jury's question: "Mere access alone to a key does not grant legal authority to use that key."[43]

Postconviction Counsel now argues that the State never presented any evidence that Mr. Elder did not have permission to use the key to the victim's house. In my view, however this argument ignores the fact that the entire defense strategy, including Mr. Elder's testimony and Mr. Welsh's closing argument, was based on the premise that Mr. Elder had not committed a burglary because the victim voluntarily let him into her home that night, not that his entry was lawful because he unlocked the door with a key he had been given permission to use.[44] Postconviction Counsel acknowledges that Mr. Welsh argued that Mr. Elder had authority or permission to enter the victim's

---

[41] *Id*. at E10.
[42] *Id*.
[43] *Id*.
[44] *See, e.g.*, 2nd Trial Tr. at C148-C150, D72.

home because he was let into the residence by the victim.[45]

It also ignores the victim's testimony and statements she made to third parties indicating that the person who raped her had entered her house without her knowledge or permission.[46] For example, she stated in her recorded police interview, which was played for the jury pursuant to 11 *Del. C.* § 3507, that she woke up to the sound of someone unlocking her door.[47] She also testified that while she was unsure exactly how the defendant entered her house, she did not want him to be there.[48] None of these statements suggest that the victim gave consent for Mr. Elder to enter her house that night, or that he had any authorization whatsoever to use Michelle's Elder's key for that purpose.

In my view, it does not matter how Mr. Elder entered the victim's house so long as the jury was convinced beyond a reasonable doubt that he did so without the victim's consent. The method of entry used is not an element of the offense, so long as the evidence established that he did not have the victim's permission to enter. The jury was not required to accept the State's argument that Mr. Elder used a key to enter the victim's house in order to conclude, beyond

---

[45] Def.'s Mtn. at 33.

[46] *See, e.g.*, 2nd Trial Tr. at A73-A74 & 2nd Trial Court Ex. 1.

[47] 2nd Trial Tr. at A62, A79-A80.

[48] 2nd Trial Tr. at B176 & 2nd Trial Ex. 41 (the victim told the SANE nurse that a masked man had entered her home and raped her, and that he had used her daughter's key).

a reasonable doubt, that his entry was unlawful.

The facts suggest that Mr. Elder had access to the key, since he was aware that his wife, with whom he shared a residence, possessed a key to her mother's house.[49] Michelle Elder testified that she typically kept the key either on a hook by the front door or inside her purse.[50] Yet the trial judge never expressed his opinion about any factual matters that the jury might have to consider, including the location of the key to the victim's house, whether Mr. Elder had permission to use the key, or whether Mr. Elder had ever been in possession of the key. Instead, the Court instructed the jury that the mere fact that a person has access to a key, absent something more, does not mean that person thereby has authorization to use that key for purposes of analyzing the elements of a burglary charge. This is a generalized statement of the law and did not suggest that the State had in fact proven that Mr. Elder had access to the victim's house key.

Assuming *arguendo* that the Court's jury instruction did address a factual issue in the case, it did so in the context of clarifying a legal issue that had been raised by the jury's question. The Delaware Supreme Court has stated:

> Trial judges may properly combine a statement regarding a fact in issue with a declaration of law. An improper comment or charge as to "matters of fact" is an expression by the court, directly or indirectly, that

---

[49] 2nd Trial Tr. at Cl48- Cl49.
[50] *Id*. at A35-A36.

conveys to the jury the court's estimation of the truth, falsity or weight of testimony in relation to a matter at issue. It is not entirely improper for a trial judge to explain the legal significance which the law attaches to a particular factual finding. Similarly, a trial judge may properly state a fact at issue and declare the legal consequences of evidence that is missing in a criminal proceeding.[51]

Even if the Court's supplemental instruction touched on a factual issue, therefore, it was appropriately given because "[t]he trial judge made an accurate statement of the law and explained the legal significance the law attached to particular facts," and "[t]he trial judge neither commented on the weight of the evidence nor the credibility of the witnesses."[52] "Here, the trial judge acted within the bounds of the Delaware Constitution because none of his statements conveyed the court's estimation of the truth or weight of the testimony."[53]

The Court's answer to the jury's question was a correct statement of the law. There is no reason to believe that a direct appeal of this instruction by Mr. Welsh would have been successful. Assuming *arguendo* Mr. Welsh committed error on direct appeal, the error was harmless in the overall context of Mr. Elder's case. He was given a life sentence on each of the three violent felonies

---

[51] *Herring v. State*, 805 A.2d 872, 876 (Del. 2002).
[52] *Id.*
[53] *Miller v. State*, 893 A.2d 937, 956 (Del. 2006). *See also Barksdale v. State*, 832 A.2d 1250 (Table), 2003 WL 22227552, at ¶¶ 2-5 (Del. Sept. 24, 2003).

for which he was convicted and declared to be a habitual offender pursuant to 11 *Del. C.* § 4214(a).[54] The Court's supplemental jury instruction was only pertinent to the burglary charge and had no impact on either of the rape offenses. Therefore, Mr. Elder's situation would not have materially changed because he would still be serving two life sentences in connection with the two rape convictions.

I deny this claim.

### *Pro Se* Claim 1 – Judicial Bias

In his first *pro se* claim, Mr. Elder asserts that Mr. Welsh was ineffective for failing to move for a mistrial or argue on direct appeal that the trial judge was not impartial. Mr. Elder gives a long litany of examples of judicial bias against him and in favor of the State, many of which overlap with other claims he asserts. I am not going to address them *seriatim*, because they are completely self-serving and conclusory. In my view, none of Mr. Elder's allegations establish any bias or prejudice on the part of the trial judge. Therefore, Mr. Welsh could not have rendered ineffective assistance by failing to request a mistrial or file a direct appeal based on this issue.

Mr. Elder cites no case law addressing the legal standard for demonstrating improper bias on the part of a trial judge. Our Supreme Court has held that when

---

[54] Sentence Order dated January 26, 2018.

faced with a claim of personal bias, the judge is required to engage in a two-part analysis: "First, he must, as a matter of subjective belief, be satisfied that he can proceed to hear the cause free of bias or prejudice concerning that party. Second, even if the judge believes that he has no bias, situations may arise where, actual bias aside, there is the appearance of bias sufficient to cause doubt as the judge's impartiality."[55]

Nor has Mr. Elder applied that standard to the facts of this case. Instead, this claim for relief is based on a series of examples which Mr. Elder subjectively believes show the Court's bias in favor of the State.

Many of the actions about which the defendant now complains were done as part of the Court's normal role as the gatekeeper to admission or exclusion of evidence."[56] "It is well-settled that a trial judge is responsible for management of the trial and is vested with broad discretion to perform that function. Delaware Rule of Evidence 611(a) recognizes that the trial judge has authority to determine the mode and manner of a witness's testimony."[57]

In his Trial Counsel Affidavit, Mr. Welsh could not point to a specific event, comment or decision made by the trial judge which would have given him

---

[55] *State v. Cooke*, 2010 WL 3734113, at *30 (Del. Super. Aug. 19, 2010) (quoting *Los v. Los*, 595 A.2d 381, 384-85 (Del. 1991)).
[56] *Banther v. State*, 823 A.2d 467, 487 (Del. 2003).
[57] *Czech v. State*, 945 A.2d 1088, 1095 (Del. 2008).

any basis to ask for a mistrial nor seek a recusal of the trial judge. Mr. Elder has not offered any factual or legal analysis suggesting that he would have been entitled to a mistrial based on the trial judge's actions in this case. Consequently, he has failed to show under *Strickland* that Mr. Welsh's representation fell below an objectively reasonable standard, or that he suffered prejudice as a result.

I deny this claim.

### *Pro Se* Claim 2 – Prosecutorial Misconduct

Mr. Elder's second *pro se* claim asserts that he suffered a Sixth Amendment violation of ineffective assistance of counsel from prosecutorial misconduct. He argues that the State committed misconduct during his trial in four ways: by twice introducing false evidence, by cross examining him on his post-arrest, post-*Miranda* silence, by using his expert witness's draft report to cross examine the expert witness, and by making improper comments in closing argument. He argues that Mr. Welsh should have objected to these actions at trial and on direct appeal.

### False Evidence

Mr. Elder highlights some inconsistencies in Michelle Elder's testimony about the key to her mother's house and the timing of the State's first prison call subpoena. I have already addressed the latter, above. Mr. Elder also states that

the State should not have questioned him about statements he made during a prison call to Michelle Elder because it is based on her false statement, which he likens to entrapment.

I see no evidence on the record whatsoever that the State elicited false testimony from Michelle Elder. The fact that her testimony is inconsistent with her prior out-of-court statements or other parts of her in-court testimony does not mean that that testimony is false or that the questioner is acting in bad faith. She could be mistaken or suffering from memory lapses. Michelle Elder was not a friendly witness to the State, especially in the second trial, where the State had to refresh her recollection several times with the transcript of her testimony from the first trial.

In his Trial Counsel Affidavit, Mr. Welsh agrees that Michelle Elder was a tricky witness for a variety of reasons, including her constantly shifting loyalties and her continued communication with Mr. Elder throughout the pendency of his case. Mr. Welsh did not believe that he had any legal basis to prevent her from testifying or to claim that the State had knowingly elicited false testimony. When the parties are faced with a witness who makes inconsistent statements, it becomes fodder for impeachment by opposing counsel and an issue for the jury to consider when evaluating the witness's credibility. That is

all that happened in this case.

Nor is the fact that the State recited the contents of one of Mr. Elder's telephone calls with his wife, the recording of which had already been entered into evidence, improper. By choosing to testify, Mr. Elder opened himself to cross-examination and the State was entitled to explore issues related to his credibility, including his prior recorded statements to his wife about the incident with the victim. The fact that he disagrees with the evidence or the inferences the jury was asked to draw from it does not mean that it was improperly admitted.

Mr. Elder thus fails to adequately explain the basis for this claim. Rule 61 requires that a Motion for Postconviction Relief "shall specify all the grounds for relief which are available to the movant and of which the movant has or, by the exercise of reasonable diligence, should have knowledge, and shall set forth in summary form the facts supporting each of the grounds thus specified."[58] "[A] movant must support his or her assertions with 'concrete allegations of actual prejudice, or risk summary dismissal.'"[59] Here, "[i]t plainly appears from the motion that Defendant has not shown entitlement to relief. Defendant's [claim] is completely conclusory, and [he] has failed to support his claim[] with facts. For

---

[58] Super. Ct. Crim. R. 61(b)(2).
[59] *State v. Johnson,* 2009 WL 638511, at *1 (Del. Super. Mar. 12, 2009), *affd*, 977 A.2d 898 (Del. 2009) (quoting *State v. Childress*, 2000 WL 1610766, at* 1 (Del. Super. Sept. 19, 2000)).

these reasons Defendant's [claim] warrants summary dismissal,"[60] and is dismissed.

**Cross-Examination on Silence**

Mr. Elder argues that the State improperly commented on his right to remain silent by asking him about differences between his post-arrest interview and his in-court testimony. However, he never invoked his right to remain silent. Thus, his citation of cases holding that defendants who choose to testify on their own behalf cannot be cross-examined about their post arrest silence is misplaced. Mr. Elder voluntarily waived his *Miranda* rights and gave a lengthy statement to police about the incident for which he was being arrested.

Our Supreme Court has held:

> [A] defendant who offers an exculpatory version of events at trial may not be cross examined on his failure to have told that story on a prior occasion after he had received *Miranda* warnings and chose to remain silent. Nevertheless, where a defendant decides to "cast aside the cloak of immunity" and "take the stand in his own behalf, he does so as any other witness, and within the limits of appropriate rules, he may be cross examined as to the facts in issue.[61]

The Court recognized that "cross examination based upon prior inconsistent

---

[60] *Id*. at *2.
[61] *MacDonald v. State*, 816 A.2d 750, 753 (Del. 2003) (internal citations omitted).

statements made by the defendant does not constitute 'unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent.'"[62] "Therefore," the Court ruled, "the State may properly cross examine a defendant on his pre-arrest conduct, and on prior inconsistent statements made after he voluntarily waives his *Miranda* privileges."[63]

Here, Mr. Elder's in-court testimony included a number of exculpatory claims that were not present in the original post-*Miranda* statement he chose to make to law enforcement. Highlighting those omissions and inconsistencies, to show how his story had changed over time, was an appropriate method of cross examination by the State in a case where Mr. Elder had chosen to "cast aside the cloak of immunity" by agreeing to give a statement to police and then testifying in his own defense at trial.

### Use of Expert Witness' Reports

Mr. Elder argues that the State violated his Due Process rights by entering into evidence both the draft and final reports prepared by his expert witness, Dr. Kathleen Brown, and by cherry picking information from those reports. This

---

[62] *Id.* at 753-54 (quoting *Anderson v. Charles*, 447 U.S. 404, 408 (1980)).
[63] *Id.* at 754 (internal citations omitted).

is simply untrue -- neither Dr. Brown's draft report nor its final version were entered into evidence at trial. The State simply questioned Dr. Brown about the reports.

This claim is comprised solely of conclusory assertions that the defendant's rights were violated, without any factual or legal support. Therefore, I could summarily dismiss it.[64] But when I consider it on its merits, Mr. Elder has failed to establish that the State's use of, and references to, Dr. Brown's reports at trial were improper.

Pursuant to the reciprocal discovery requests in this case, Mr. Elder was required to disclose to the State "any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with the particular case ... which were prepared by a witness whom the defendant intends to call at the trial when the results or reports relate to that witness' testimony."[65] Dr. Brown prepared both her draft report and the final version in her capacity as a medical expert hired by the defense to challenge the results of the victim's SANE examination.

The differences between the draft report and the final version were

---

[64] Super. Ct. Crim. R. 61(b)(2).
[65] Super. Ct. Crim. R. 16(b)(l)(B).

significant: in the draft, Dr. Brown included material far outside her area of expertise, such as trial strategy. The Court, as part of its gatekeeping role, told Mr. Welsh that he should provide the draft report to the State because it could be relevant for cross examination purposes,[66] and Mr. Welsh had also voluntarily offered to provide the draft report to the State.

Calling a witness to testify necessarily means that the witness will be subjected to cross examination by the opposing party. "[C]ross examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility."[67] One of the ways in which a witness's credibility can be tested is by asking about possible sources of bias, which includes evidence tending to show that an expert witness did not render his or her opinion in an impartial manner. As the Court correctly recognized, the reported differences between Dr. Brown's initial report and the final report that was provided to the State were relevant to Dr. Brown's credibility. The State only asked a few surface level questions about the draft report at trial, and Dr. Brown was afforded the opportunity to explain why she made

---

[66] *Rodriguez v. State*, 30 A.3d 764, 769 (Del. 2011) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)) ("The purpose of the trial judge's gatekeeping role 'is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'").

[67] D.R.E 611(b).

the changes in the final report. The Court sustained Mr. Welsh's objections as soon as the State attempted to explore the issue in any depth and told the State to move on. Mr. Elder has established neither that his rights were violated nor that he suffered any prejudice because of the State obtaining possession of Dr. Brown's draft report or in the few brief references that were made to it during trial.

Mr. Elder argues that the State quoted portions of Dr. Brown's final report while cross examining her. He asserts that this was improper under Delaware Rule of Evidence 612, which addresses documents that have been used to refresh a witness's recollection. However, Dr. Brown was testifying as an expert witness who was rendering opinions based on factual information which she had been given to review; as a result, it was appropriate for the State to cross-examine her based on the information laid out in her expert report.[68] The references to Dr. Brown's report were a standard part of the cross examination process for an expert witness, and Mr. Elder has failed to establish any error in connection with this claim.

---

[68] See D.R.E. 705(a) ("Disclosure of Facts and Data Underlying an Expert Opinion. Unless the court orders otherwise, an expert may state an opinion - and give the reasons for it - without first testifying to the underlying facts or data. But the expert may be required to disclose those facts or data on cross examination.").

## States's Closing Argument

Mr. Elder raises three objections to different parts of the State's closing argument, including: its statement that his credibility was in question because he had lied to police about his ski mask; references to the "false evidence," which was discussed above and will not be discussed further here; and misrepresenting the wording of one of Dr. Brown's conclusions. He argues that trial counsel was ineffective for failing to object to these statements (and to the admission of the underlying evidence upon which they were based), and for failing to raise them on direct appeal. This claim fails to state a valid ground for relief because none of the statements identified by Mr. Elder were improper and, therefore, Mr. Welsh had no basis upon which to object to them.

The Delaware Supreme Court has held that:

> [P]rosecutors may refer to statements or testimony as a lie only (1) if one may legitimately infer from the evidence that the statement is a lie and (2) if the prosecutor relates his argument to specific evidence which tends to show that the testimony or statement is a lie.[69]

Here, Mr. Elder repeatedly admitted that his statements to police about the ski mask were lies, and it was the defense that first introduced the fact that he

---

[69] *Clayton v. State*, 765 A.2d 940, 943 (Del. 2001), holding modified by *Baker v. State*, 906 A.2d 139 (Del. 2006).

had lied to police when he was testifying on direct examination. The State later incorporated that information into its closing argument to impeach Mr. Elder's credibility. The word "lie" was linked only to the ski mask. Thus, the State's comments were not inappropriate. Mr. Elder objects to the State's closing statement that an "object, finger, or penis" was the cause of one of the injuries to the victim's genitalia, according to Dr. Brown. Mr. Elder asserts that the State was misrepresenting Dr. Brown's testimony by suggesting that the object in question had to be either a finger or a penis. This has no basis in fact and Mr. Welsh had no basis upon which to raise an objection at trial or on direct appeal.

None of the incidents identified in Mr. Elder's second *pro se* claim for relief constitute prosecutorial misconduct and, therefore, he has failed to establish that Mr. Welsh committed error by choosing not to object at trial and/or failing to include this ground in the direct appeal. Even if the defendant had successfully demonstrated the existence of prosecutorial misconduct, however, he still cannot establish that he was prejudiced, entitling him to a reversal of his convictions. The Delaware Supreme Court has opined:

> [H]aving found prosecutorial misconduct, the next step is to determine whether that misconduct requires reversal. In *Hughes v. State*, this Court adopted a three-part test to evaluate prosecutorial misconduct: "the closeness of the case, the centrality of the issue affected by the (alleged) error, and the steps

36

taken to mitigate the effects of the error."[70]

The Court noted:

> [I]f we were reviewing this issue on a "clean slate," it is not clear that we would conclude that the improper comments "were so prejudicial as to compromise the fairness of the trial process." But, unfortunately, we are reviewing what can only be described as a persistent pattern of prosecutorial misconduct. As the Court pointed out in 1987, "[a] repetition of the same type or category of errors adversely affects the integrity of the judicial process." In this case, we find that the prosecutor's improper comments cover several of the specific categories of comment that have been prohibited in past decisions. Accordingly, we conclude that the integrity of the judicial process was compromised by the prosecutor's misconduct and that the convictions appealed from must be reversed.[71]

Even if one or more of the issues raised by the defendant in this ground for relief could be deemed improper, they cannot reasonably be characterized as "a persistent pattern of prosecutorial misconduct" that compromised the integrity of the judicial process in this case. Mr. Elder is not entitled to relief on this ground.

**_Pro Se_ Claim 3 – Failure to Cross Examine Witnesses**

---

[70] _Hunter v. State_, 815 A.2d 730, 737 (Del. 2002) (quoting _Hughes v. State_, 437 A.2d 559, 571 (Del. 1981)).

[71] _Id_. at 737-38 (footnotes omitted).

Mr. Elder next alleges that Mr. Welsh was ineffective because of his failure to effectively cross examine Michelle Elder and the State's SANE nurse. Because of this failure, Mr. Elder claims, exculpatory testimony was available to Mr. Welsh but never presented to the jury. This Court has stated:

> A criminal defense attorney is given wide latitude in making strategic trial decisions; this extends to the conduct of cross examination. The questions to be asked and how a given cross examination is conducted are tactical decisions. And when challenging those decisions, the movant has the burden of supplying precisely what information would have been obtained had counsel conducted the cross as the complaining inmate desired and just how this information would have changed the result of his trial.[72]

"The defendant must 'substantiate his concrete allegations of actual prejudice or else risk summary dismissal.'"[73] As discussed below, in my view Mr. Elder has failed to meet this burden with respect to Mr. Welsh's cross examination of both witnesses.

**Michelle Elder**

Mr. Elder argues that it was unreasonable for Mr. Welsh to allow Michelle Elder to testify that she did not remember anything about the spare key to the victim's house and not cross examine her using her prior statements about the

---

[72] *State v. Lindsey,* 2023 WL 2535895, at *6 (Del. Super. Mar. 16, 2023) (citations omitted).
[73] *State v. Powell,* 2016 WL 3023740, at *25 (Del. Super. May 24, 2016), *affd,* 173 A.3d 1044 (Del. 2017) (quoting *Outten v, State,* 720 A.2d 547,557 (Del. 1998)).

location of her mother's key. Mr. Elder asserts the issue of the spare key was critical because if he did not have the key then the victim must have opened the door. This is not accurate. There were other ways in which Mr. Elder could have entered the victim's home. As discussed above, the State was not required to prove how the defendant got into the victim's house, only that he did so without authorization. While the State theorized that the defendant used his wife's spare key, the possibility remains that he was able to enter through an unlocked door or window, or that he found some other way to get inside. The jury ultimately decided that the evidence presented was sufficient to establish, beyond a reasonable doubt, that the defendant unlawfully entered the victim's house.

Mr. Elder fails to recognize that his wife's testimony and memory lapses were a double-edged sword, since they occurred both on direct and cross examination and posed a hurdle for both the State and the defense. There are a number of instances in which Michelle Elder's testimony was inconsistent as between the first and second trials, or for which she claimed to have a faulty memory. This highlights the difficulties she posed for both the State and the defense, and it is unclear to me what Mr. Welsh would have been able to achieve by repeatedly cross examining Michelle Elder on every apparent inconsistency in her testimony. Indeed, in his trial Counsel Affidavit, Mr. Welsh

identified a number of ways in which Michelle Elder was a tricky witness whose testimony about the key to her mother's house lacked clarity and consistency.

The State's theory was that Mr. Elder took the key from Michelle Elder's house (either from the hook near her front door or from her purse), used it to enter the victim's house, and put it back in Michelle Elder's purse just prior to his arrest. The defendant does not explain why the jury having the information about where the key originated (i.e., from the hook versus the purse), is in any way relevant to where the key was found, since he could have taken the key from either location. The jury was already aware that there were discrepancies in Michelle Elder's recollections about the key, given her testimony on direct examination and the information Mr. Welsh elicited during cross examinations of Michelle and of other witnesses.

Mr. Elder has failed to establish that supplying the jury with any additional information about the key would have made a difference in the outcome, aside from conclusory statements and pure speculation.

**SANE Nurse**

Mr. Elder likewise argues that Mr. Welsh was ineffective because he failed to effectively cross-examine the State's SANE nurse on the change in her testimony between the first and second trials with respect to the timing and use

of the speculum and its relation to the victim's injury. Mr. Elder would have me believe that she admitted to having caused the victim's vaginal injuries and that she fabricated parts of her testimony during the second trial. The reason why the nurse's testimony was more detailed during the second trial was a good one. The State learned a lesson from the first trial, which resulted in a hung jury, and attempted to avoid that result in the second trial. In the first trial, the jury was confused and submitted questions to the trial judge about sexual penetration and sexual intercourse. To avoid this in the second trial, the State presented much more detailed testimony from the nurse. This does not mean that the nurse's testimony was false or unreliable. There is no reason to believe that the result of Mr. Elder's second trial would have been different if Mr. Welsh had cross examined the nurse more extensively about her testimony from the first trial.

For both witnesses discussed above, Mr. Elder has failed to meet his "burden of supplying precisely what information would have been obtained had counsel conducted the cross as [he] desired and just how this information would have changed the result of his trial."[74] The evidence of record shows that "[t]rial counsel's performance fell within 'the zone of reasonableness' to which the defendant is entitled. Moreover, [the defendant] has not substantiated his

---

[74] *Lindsey,* 2023 WL 2535895, at *6.

allegations of actual prejudice. For example, even if, as [the defendant] now posits, trial counsel had elicited" the types of statements identified in the defendant's supplemental filing, the defendant "is unable to demonstrate how this testimony would have changed the trial's outcome."[75]

For all these reasons, Mr. Elder's third *pro se* claim for relief is denied because he has failed to establish that Mr. Welsh's performance was deficient, and he has offered nothing more than conclusions and speculation that the result of his second trial would have been different if Mr. Welsh had cross examined these two witnesses in another manner.

## *Pro Se* Claim 4 – Failure to Challenge DNA Search Warrant

Mr. Elder argues that Mr. Welsh's representation was ineffective because of his failure to challenge the legality of the probable cause affidavit which supported the search warrant that was used to collect Mr. Elder's DNA sample. Mr. Elder attributes the illegality of the probable cause affidavit to a variety of factors: the timing of some of the information in the affidavit (suggesting that the detective lied), the inclusion of the victim's recorded interview, the untrustworthiness of the victim's and the SANE nurse's statements because they

---

[75] *Powell,* 2016 WL 3023740, at *25 (citing *Monroe v. State*, 2015 WL 1407856, at *4 (Del. Mar. 25, 2015)).

were controlled by Michelle Elder, the warrant was a "general warrant," and the warrant did not comply with 11 *Del. C.* § 2306. Yet Mr. Elder, without explanation, does not believe that a *Franks*[76] hearing was appropriate.

As a threshold matter, Mr. Elder's statements are general, conclusory and without factual or legal basis. I could therefore summarily dismiss this claim.[77] However, I will briefly address the claim.

With respect to the timing of some of the information in the affidavit and the potential lies by the detective, Mr. Welsh in his Affidavit and post-trial communication with Mr. Elder states that he looked at this and decided for both legal and strategic reasons not to pursue it. Moreover, some of the detective's inconsistent statements came out on examination at trial, so Mr. Welsh would not have had that information for a pre-trial motion.

Mr. Welsh's Affidavit also explains that he did not file a motion to suppress the DNA warrant because the entire defense was that a consensual sex encounter had occurred, and therefore the presence of Mr. Elder's DNA was not inculpatory, but consistent with the defense. This defense was necessitated by Mr. Elder's statement to the police at the time of his arrest.

Even if Mr. Welsh was ineffective for not attempting to suppress the DNA

---

[76] *Franks v. Delaware*, 438 U.S. 154 (1978).
[77] Super. Ct. Crim. R. 16(b)(2).

search warrant, Mr. Elder has failed to establish that he suffered prejudice as a result. From the beginning, starting with his post-*Miranda* interview on the night of his arrest, Mr. Elder asserted that he engaged in consensual sexual contact with the victim. He then repeated that story throughout the pendency of this case, both during his trial testimony and in communications with family members. Mr. Welsh argued that Mr. Elder had engaged in sexual conduct with the victim, but had not penetrated her vagina. Mr. Welsh used the absence of the defendant's DNA on the victim's internal vaginal swab to bolster that argument. In his *Pro Se* Motion, Mr. Elder makes precisely the same argument, using the very DNA he now seeks to challenge. He can't have it both ways.

The defendant's admissions to police required Mr. Welsh to make several strategic decisions in determining how to mount a viable defense. The actions trial counsel took with respect to the DNA search warrant were consistent with the defense's strategy of acknowledging that some sexual contact occurred while claiming that it was consensual and did not involve any vaginal penetration. "[T]he decision whether to file a given motion is a strategic decision and a matter of professional judgment. Such a decision will be upheld if it is reasonable. And an inmate cannot demonstrate prejudice by defense counsel's failure to file any

44

motion if that motion were likely to fail even if it were filed."[78]

For these reasons, I deny this claim.

***Pro Se* Claim 5 – Failure to Suppress Evidence**

Mr. Elder next argues that Mr. Welsh failed to protect him from the admission of multiple inadmissible items of evidence that were collected as the result of an unreasonable search and seizure. Mr. Elder asserts that, because he had lied to police about putting his ski mask inside the barbeque grill, Mr. Welsh's failure to challenge the seizure of the mask forced him to testify and expose himself to cross-examination in order to explain the lie to the jury. This argument fails for at least two reasons.

First, there were other reasons Mr. Elder had to testify, such as his testimony that the incident was consensual and that the victim voluntarily let him into her house.

Second, Mr. Welsh did in fact schedule such a suppression hearing, but the key witness who had provided consent to the search of the house, Michelle Elder, failed to show up. As a result, the Court denied the motion to suppress, and indicated that Mr. Welsh would only have the opportunity to pursue the motion any further if he were able to produce some sort of documentary proof

---

[78] *State v. Lindsey,* 2023 WL 2535895, at *6 (Del. Super. Mar. 16, 2023) (footnotes omitted).

that the signature on the consent form did not belong to Michelle Elder.

Mr. Elder now asserts that Mr. Welsh should have moved to reopen the suppression motion, presenting a handwritten letter from Michelle Elder claiming that, although the signature is hers, it was obtained at a later date. I give this document very little credibility; it is not sworn, it is undated, and is only partial. In his Affidavit, Mr. Welsh states that, the day before the scheduled suppression hearing, Michell Elder told him that the consent was not hers.

Mr. Elder argues the consent issue at length. But if he wanted to do this, the time to do so was on February 9, 2017, at the scheduled suppression hearing. Trial counsel attempted to challenge the search but ultimately failed because Michelle Elder, whose testimony was critical to the motion, failed to appear in court despite being aware of the date and time of the hearing. Mr. Elder cannot relitigate this issue now, under the guise of a claim for postconviction relief. Additionally, the new evidence being proffered by Mr. Elder lacks credibility and does not meet the criteria set by the Court, which made clear that the motion to suppress could only be reopened based on hard, scientific evidence that put validity of the signature into question, not just a claim from Michelle Elder about whether and when she signed the consent form or not.

The evidence of record shows that Mr. Welsh considered multiple avenues

for challenging the search of the defendant's house, including pursuing a motion to suppress that was eventually denied by the Court. Mr. Welsh had no valid basis to readdress the suppression issue, and even if he had done so there is no reason to believe such an attempt would have been successful given the wealth of evidence in the State's possession showing that Michelle Elder had given both written and verbal consent for police to search the house. Mr. Elder cannot show that Mr. Welsh rendered ineffective assistance of counsel, nor can he establish that he suffered any prejudice as a result.

I deny this claim.

### *Pro Se* Claim 6 -- Improper Jury *Venire*

Mr. Elder next argues that Mr. Welsh was ineffective because he failed to object at trial or argue on direct appeal that the jury venire did not represent a fair cross section of the community. Mr. Elder argues that he suffered prejudice because a significant number of people in the jury selection pool were either law enforcement and/or people who had previously served on a jury.

As a threshold matter, Mr. Elder's statements are general, conclusory and without factual or legal basis. For example, while Mr. Elder cites cases that discuss, in a general manner, how defendants have the right to an impartial jury selected from a representative cross section of the community, he has neglected

to offer details explaining how those cases apply to the specific facts of this case. I could therefore summarily dismiss this claim.[79] However, I will briefly address the claim.

The general thrust of Mr. Elder's claim is that any prospective juror with ties to law enforcement should have either been questioned more thoroughly or been excluded from the jury panel as presumptively biased. However, he cites no case law supporting this proposition.

Mr. Elder identified two specific members of the jury panel as being relevant to this claim: G.B. (who was struck by the defense) and P.S., who was eventually seated as juror number 10. According to Mr. Elder, P.S. should have been questioned more by Mr. Welsh, in which event his answers would have been cause for challenge by Mr. Welsh. However, other than noting that P.S.'s juror profile indicated that he was employed by the State of Delaware, previously served on a jury, and previously was employed by law enforcement, Mr. Elder offers no explanation whatsoever why those factors, in and of themselves, are relevant to his claim or what specific action Mr. Welsh should have taken.

Mr. Elder is also unaware of or disregards the fact that the *voir dire* process in Delaware affords attorneys very limited involvement in the process as compared

---

[79] Super. Ct. Crim. R. 16(b)(2).

to many other jurisdictions where they are permitted to directly question prospective jurors about a wide range of information. While Delaware attorneys have the opportunity to submit questions to the Court in advance, it is ultimately the trial judge's decision as to what questions will be posed to the *venire*.[80] The Court routinely asks a standard list of questions to members of the jury panel. Anyone who answers "yes" to one or more of the Court's questions is then called up to sidebar for additional questioning, after which the Court decides if that prospective juror should be removed for cause.

This very procedure was used in this case. More than half of the prospective jurors in this case were excused for cause after answering "yes" to one or more of the Court's questions and coming to sidebar to explain their answers to the attorneys and the Court. Almost all of them were excused for a few particular reasons: because they indicated that they had prior knowledge of the case; had a close relationship with one or more of the prospective witnesses; could not handle the subject matter; and/or would give greater weight to the testimony of law enforcement officers. In other words, prospective jurors in Mr. Elder's case were questioned as to possible sources of bias that they might have and then excused for cause if it appeared that they would not be able to serve in a

---

[80]Super. Ct. Crim. R. 24(a).

fair and impartial manner.

Mr. Elder has failed to specify what Mr. Welsh should have done differently during *voir dire,* nor has he offered any explanation for how he was prejudiced by the jury selection process in this case.

I deny this claim.

**Pro Se Claim 7 – Cumulative Effect of Errors**

Mr. Elder's final *pro se* claim asserts that, even if none of the individual claims discussed above is sufficient to establish that he is entitled to relief, all the claims when taken together as a whole have a cumulative effect which rises to the level of reversible error. As a corollary, he argues that Mr. Welsh's performance was ineffective because he failed to argue cumulative error either at trial or on direct appeal.

Mr. Elder's cumulative prejudice argument gains no more persuasiveness for the claims jointly than it did for the claims severally. "Because [the defendant] has failed on each count to prove that his trial counsel was deficient and that, but for trial counsel's performance, the outcome of his trial or sentencing would have been different, he fails in the aggregate."[81]

Even if Mr. Elder had established the existence of one or more errors by

---

[81] *State v. Peters*, 283 A.3d 668, 697 (Del. Super. 2022).

Mr. Welsh, he has failed to show that he is entitled to relief based on cumulative error. "Where there are multiple errors in a trial, the Court weighs their cumulative effect to determine if, combined, they are 'prejudicial to substantial rights [so] as to jeopardize the fairness and integrity of the trial process.'"[82]  Mr. Elder argues that he has demonstrated that, absent Mr. Welsh's errors, the outcome of his second trial would have been different because his first trial, which had no errors, ended in a hung jury. He asks me to assume that Mr. Welsh's errors in the second trial were responsible for his conviction. While this self-serving argument is clever, I decline to do so. There are numerous other possible reasons for the different results in the two trials. It does not follow *a fortiori* that the fact that the results of the first and second trials were different means that Mr. Welsh provided ineffective assistance of counsel.

The jury considered the sometimes inconsistent evidence as a whole and made one story of it all. They were evidently persuaded by the wealth of evidence showing that this incident was, in fact, a violent sexual assault on an elderly victim by a perpetrator who attempted to disguise his identity because the victim could otherwise have easily identified him.

I deny this claim.

---

[82] *Johnson v. State*, 129 A.3d 882 (Table), 2015 WL 8528889, at *3 (Del. Dec. 10, 2015).

**Conclusion**

"'Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.'"[83] Despite our Supreme Court's prohibition on analyzing trial counsel's performance through the "distorting effects of hindsight,"[84] the arguments set forth in the Motion do just that. Mr. Elder's claims are based on conclusory assumptions that, had Mr. Welsh acted differently, he would have somehow been able to overcome the substantial evidence the State produced at trial.

In light of the highly deferential approach I should take when reviewing such claims, and the strong presumption that counsel's conduct was professionally reasonable, Mr. Elder has not shown that Mr. Welsh's representation fell below an objective standard of reasonableness or that there is a reasonable probability that, but for Mr. Welsh's errors, the result of the case would have been different.

---

[83] *Wright,* 671 A.2d at 1356-57 (quoting *Strickland v. Washington,* 466 U.S. at 689).
[84] *Albury,* 551 A.2d at 59.

"The defendant is entitled to a fair trial, not a perfect trial."[85] In my view, Mr. Elder received a fair trial, and his dissatisfaction with the outcome neither changes that fact nor demonstrates that Mr. Welsh provided ineffective assistance of counsel under the standards set forth in *Strickland*.

For the reasons discussed above, the request for an evidentiary hearing is **DENIED** and the Motion is **DENIED**.

**IT IS SO ORDERED**.

/s/ Craig A. Karsnitz

cc:    Prothonotary
       Stephen W. Welsh, Esquire

---

[85] *State v. Swan*, 2020 WL 7259626, at *20 (Del. Super. Feb. 21, 2020), *aff'd,* 248 A.3d 839 (Del. 2021).